**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@kr.law
Katherine E. Hollist (*pro hac vice* forthcoming)
kate@kr.law
Leah Rosa Vulić (Bar No. 343520)
leah@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**
Raphael Janove (*pro hac vice* forthcoming)
rafi@pollockcohen.com
Adam Pollock (*pro hac vice* forthcoming)
adam@pollockcohen.com
George Krebs (*pro hac vice* forthcoming)
gkrebs@pollockcohen.com
111 Broadway, Ste. 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (*pro hac vice* forthcoming)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

*Attorneys for Plaintiff and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LOREN KELLY,** on behalf of himself and all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>**FUNPLUS INTERNATIONAL AG,** a Swiss public limited company, and **KINGSGROUP HOLDINGS,** a Cayman Islands corporation,<br><br>　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

1

**TABLE OF CONTENTS**

2   **PRELIMINARY STATEMENT**.........................................................................................1

3   **JURISDICTION AND VENUE**.......................................................................................3

4   **INTRADISTRICT ASSIGNMENT**..................................................................................5

5   **FACTUAL ALLEGATIONS**...........................................................................................5

6   **False Strikethrough Packs** ........................................................................................13

7   **False Bonus Packs** ....................................................................................................16

8   **False Limited Availability Packs** ..............................................................................17

9   **Loot Boxes** .................................................................................................................19

10  **CLASS ALLEGATIONS** .............................................................................................23

11  **CALIFORNIA LAW APPLIES TO ALL CLASSES**.....................................................26

12  **FIRST CLAIM FOR RELIEF (UCL)** ............................................................................27

13  **SECOND CLAIM FOR RELIEF (FAL)** ........................................................................32

14  **THIRD CLAIM FOR RELIEF (CLRA)** .........................................................................33

15  **FOURTH CLAIM FOR RELIEF (Fraud)** ....................................................................35

16  **FIFTH CLAIM FOR RELIEF (Unjust Enrichment)** ...................................................36

17  **PRAYER FOR RELIEF** ...............................................................................................36

18  **DEMAND FOR JURY TRIAL**......................................................................................39

19

20

21

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1

## TABLE OF AUTHORITIES

2                                                                                         Page(s)

3   Cases

4   *Epic Games, Inc. v. Apple Inc.*,

5       559 F. Supp. 3d 898 (N.D. Cal. 2021) .......................................................... 6

6

7   Statutes

8   15 U.S.C. §45(a)(1)............................................................................ 28, 29

9   15 U.S.C. §52(a) ............................................................................... 28, 29

10  28 U.S.C. §1332(d)(2)............................................................................... 4

11  28 U.S.C. §1391(b)(1) ............................................................................... 5

12  28 U.S.C. §1391(b)(1) – (2) ....................................................................... 5

13  28 U.S.C. §1391(b)(2)............................................................................... 5

14  28 U.S.C. §1391(b)(3)............................................................................... 5

15  Art. IV §1 of the U.S. Constitution ........................................................ 27

16  Cal. Bus. & Prof. Code §17501 ....................................... 2, 29, 30, 32

17  Cal. Business & Professions Code §§17200...................... 27, 28, 37

18  Cal. Business & Professions Code §§17500 ............................... 32

19  Cal. Civ. Code. §1770(a)(5) .................................................... 33

20  Cal. Civ. Code. §1770(a)(13) .................................................. 34

21  Cal. Civ. Code. §1770(a)(14) .................................................. 34

22  Cal. Civ. Code. §1770(a)(16) .................................................. 34

23  Cal. Civ. Code. §1770(a)(17) .................................................. 34

24  Cal. Civ. Code. §§1750 ........................................................... 33

25  Cal. Civ. Code. §§1761(a) and (b) ......................................... 33

26  Cal. Civ. Code §1761(d)........................................................... 33

27  Cal. Civ. Code §1770 ............................................................... 30

28  Cal. Civ. Code §1770(a)(9) ............................................... 29, 34

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

Cal. Civ. Code §§1761(a)–(b) and 1770 ......................................................... 33

Cal. Civ. Code §§1761(c) and 1770 ................................................................ 33

Cal. Civ. Code §§1761(e) and 1770.................................................................. 33

Cal. Civ. Code §§1770(a)(9) and (a)(13)......................................................... 29

Cal. Civ. Proc. Code 1021.5............................................................................ 37

Rules

Fed. R. Civ. P. 23 ............................................................... 23, 24, 25, 26, 27, 36

Regulations

16 C.F.R.§233.1............................................................................... 2, 28, 29

1  Plaintiff Loren Kelly ("Kelly" or "Plaintiff") on behalf of himself and all others similarly

2  situated, by and through his attorneys, for his Complaint against FunPlus International AG

3  and KingsGroup Holdings (collectively, "Defendants" or "FunPlus") alleges, on knowledge

4  as to his own actions, the investigation of Plaintiff's counsel, and otherwise upon

5  information and belief, as follows:

6  **PRELIMINARY STATEMENT**

7  1.  This is a class action lawsuit against FunPlus for falsely advertising price

8  discounts for in-game purchases and other deceptive and unfair business practices in its

9  mobile application game (or "app"), Guns of Glory: Lost Island ("GOG"). GOG is among

10  the highest grossing mobile strategy games across both Apple and Android devices,

11  grossing over $510 million in worldwide revenue since its 2017 launch.

12  2.  GOG has generated this half a billion dollars in revenue by offering players

13  "microtransactions"—the ability, while in the game, to make discrete in-app purchases of

14  in-game valuables necessary to level up one's account. These in-app purchases, or

15  "packs," generally range in price from $0.99 to $99.99 each.

16  3.  However, in its direct marketing to consumers (including representations

17  made at the time of purchase), FunPlus advertises false former prices to induce players

18  into believing they must act quickly to take advantage of a limited-time sale price.

19  4.  Since GOG launched in 2017 and continuing to the present day, FunPlus

20  deceives consumers by offering specific limited-time "bonuses" that purport to massively

21  discount the price of its in-game goods. It uses strikethrough pricing and percentages to

22  trick consumers into believing they are benefitting from limited-time promotions that

23  substantially increase the value of their in-game purchases, especially in relation to

24  purchases made by competing players. These purported savings are false, however,

25  because the original pricing that these ads reference are fabricated.

26  5.  These advertisements have run for years. But at no point, let alone within

27  three months of the advertised discounts, have these in-game items ever actually been

28  offered at a non-discounted price—*i.e.*, without their "limited-time" discounts. In other

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

words, FunPlus never sells these items at their "original" price. It offers false discounts from an original price that did not exist, and its players bought packs on "sale" that were the same prices they would ordinarily pay.

6.     Furthermore, the advertised "original" pricing does not reflect the prevailing market retail pricing for these virtual in-game items, which have no real-world value and whose pricing is entirely determined by FunPlus.

7.     The Federal Trade Commission ("FTC") describes these kinds of false former pricing schemes as deceptive:

> One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

16 C.F.R. §233.1(a).

8.     California statutory and regulatory law also expressly forbid such pricing schemes. Specifically, Cal. Bus. & Prof. Code §17501 states:

> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

9.     Defendants' tactics to induce players to spend tens, if not hundreds, of thousands of dollars each on purchases fall directly within the dark patterns—manipulative design practices—that the FTC identified in its September 2022 report, Bringing Dark Patterns to Light.[1]

---

[1] FTC Staff Report, *Bringing Dark Patterns to Light* (Sept. 14, 2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf [hereafter FTC Staff Report—Bringing Dark Patterns to

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

10.    As the FTC Staff Report on Dark Patterns explains, "SCARCITY," such as a "False Low Stock Message," "[c]reate[s] pressure to buy immediately by saying inventory is low when it isn't."

11.    "URGENCY," like a "Baseless Countdown Timer" or "False Limited Time Message" or "False Discount Claims," also "[c]reate[s] pressure to buy immediately."

12.    Defendants knew, or reasonably should have known, that their comparative price advertising is false, deceptive, misleading, and unlawful.

13.    Defendants have fraudulently concealed from and intentionally failed to disclose to Plaintiff and the putative class members the truth about their advertised price discounts and former prices.

14.    Through this false and deceptive marketing, advertising, and pricing scheme, FunPlus has violated California law prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading statements about the existence and amount of price reductions.

15.    The claims and issues asserted herein are governed by California state law. The State of California has the greatest interest in policing corporate conduct occurring within the State.

16.    Upon information and belief, the false advertisements and misleading statements emanated from the State of California, where FunPlus's key executives, subsidiaries, and offices are located.

17.    Plaintiff, individually and on behalf of all others similarly situated, hereby seeks restitution, injunctive relief, punitive damages, attorney's fees, and all other relief which the Court may deem appropriate.

**JURISDICTION AND VENUE**

18.    Plaintiff Loren Kelly is a resident of California. He began playing GOG in April 2023. He purchased False Strikethrough Packs, False Bonus Packs, and False Limited

_____

Light].

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   Availability Packs (defined below) which he otherwise would not have purchased had he

2   known about the deceptive advertising which he reasonably relied upon in making those

3   purchases.

4       19.     FunPlus was founded in California, apparently with the name Halfquest, and

5   has since gone through various iterations of names including "FunPlus" and "KingsGroup."

6   On information and belief, FunPlus has offices in San Francisco, San Mateo, and Irvine,

7   California. Its high-level executives are also located in California, including: (a) Yitao Guan,

8   a resident of Menlo Park and FunPlus International's co-founder and Chief Technology

9   Officer; (b) Andy Zhong a/k/a Yingwu Zhong, a resident of San Francisco and co-founder

10  and Chief Executive Officer; (c) Jeremy Horn, a resident of Los Angeles and VP Head of

11  Innovation; (d) Wei Wang, a resident of Irvine and Chief Creative Officer; and (e) Michael

12  Tong, a resident of San Francisco and Chief Strategy Officer.

13      20.     Defendant FunPlus International AG ("FunPlus International") is a Swiss

14  public limited company. FunPlus International was previously known as (i) KingsGroup

15  Europe SA, (ii) KingsGroup International AG, and (iii) KingsGroup International SA. Its

16  directors include Yingwu Zhong (a/k/a Andy Zhong).

17      21.     Defendant KingsGroup Holdings is a Cayman Islands corporation. Yingwu

18  Zhong (a/k/a Andy Zhong) is one of its two directors.

19      22.     Defendants have operated through an opaque corporate structure. On

20  information and belief, Defendants conduct business or have conducted business through

21  (i) Funplus Interactive USA Inc. d/b/a FunPlus Interactive USA LLC, a Delaware company

22  with its principal place of business in San Francisco, California; and (ii) Imagendary USA,

23  LLC f/k/a FunPlus Interactive USA LLC f/k/a KingsGroup USA, LLC, a Delaware company,

24  with its principal place of business in San Francisco, California.

25      23.     This Court has jurisdiction over this action under the Class Action Fairness

26  Act of 2005. Pursuant to 28 U.S.C. §1332(d)(2), this Court has original jurisdiction because

27  the aggregate claims of the putative class members exceed $5 million, exclusive of interest

28  and costs, and at least one of the members of the proposed classes is a citizen of a

Case No.                                    4                    **CLASS ACTION COMPLAINT**

different state than Defendants.

24.    This Court has personal jurisdiction over Defendants because they have offices and key executives in this District, committed the tortious acts alleged herein in this District, regularly conduct business in this District, and have extensive contacts with this forum. Additionally, it has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the California market, the claims described herein involve sales made to California residents, and Defendants have purposefully targeted California with their false advertisements.

25.    Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

26.    In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1), in that all Defendants reside in this District and are subject to this Court's personal jurisdiction.

27.    In the alternative, venue is proper in this District under 28 U.S.C. §1391(b)(3), to the extent there is no district in which an action may otherwise be brought under 28 U.S.C. §1391(b)(1)–(2), because Defendants are subject to this Court's personal jurisdiction.

## INTRADISTRICT ASSIGNMENT

28.    Because a substantial part of the events which give rise to Plaintiff's claims occurred in San Francisco and San Mateo counties, pursuant to Local Civil Rule 3-2, this action should be assigned to the San Francisco or Oakland Division.

## FACTUAL ALLEGATIONS

29.    GOG is a mobile application strategy game developed and operated by Defendants and available on iPhone and Android devices through the Apple App Store, Samsung Galaxy Store, Amazon Appstore, and Google Play platforms. GOG is a historical fiction, strategy, and resource management game. Aside from the fact that the aesthetics and story of the game feature guards, lords, and a player's growing estate, it otherwise possesses nearly identical gameplay and monetization features to other resource management games developed by Defendants, such as State of Survival, and Frost and

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

Flame: King of Avalon.

30.     GOG belongs to a category of apps known as "freemium" apps. A freemium app is one in which users do not have to pay to commence playing a functional game—the game is free to download and start playing.

31.     The term freemium is a misnomer, however, as users are given multiple purchase opportunities, known as microtransactions or in-app purchases ("IAPs"), to augment their playing experience. Users can buy in-game currency, weapons, garments, and even time.

32.     The popularity of freemium apps featuring in-app purchases has skyrocketed. In 2022, 97% of apps in the Google Play app store were free-to-download.[2] Even so, in-app purchases accounted for 48.2% of mobile app earnings.[3] GOG has generated over $500 million since its release.

33.     Because users can try the app for free, freemium apps acquire new users more rapidly than purchase-to-play apps. Enabling microtransactions at various points throughout game play allows users time to develop app loyalty and engagement before having to pay anything. The continued microtransactions also remove the upper limit of user spending.[4]

34.     Most of freemium app revenue is generated by big-spending "whales." In 2017, just 6% of customers on Apple's App Store accounted for 88% of all spending on games.[5]

35.     GOG has generated well over $500 million in revenue since its inception. It makes this revenue by offering players in-app purchases. These purchases include

---

[2] https://www.statista.com/statistics/263797/number-of-applications-for-mobile-phones.

[3] https://www.businessofapps.com/guide/in-app-purchases.

[4] Savannah Wei Shi, et al., *From Minnows to Whales: An Empirical Study of Purchase Behavior in Freemium Social Games*, Int'l J. of Elec. Com. (2015).

[5] *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 954 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded on other grounds*, No. 21-16506, 2023 WL 3050076 (9th Cir. Apr. 24, 2023).

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

building material, "recruitment banners," speed-ups, and other valuables. An "in-app purchase" refers to a financial transaction initiated from within the mobile application itself. The most common form of in-app purchases is for bundled groups of resources, or "packs," generally ranging in price from $0.99 to $99.99 each.

36.     Players engage in "microtransactions" to make in-app purchases containing items that are necessary to progress their account further and maintain competitiveness with other players. This business model contrasts with that of many other popular free apps which offer only non-essential or cosmetic items for purchase. Because GOG offers in-app purchases that advance one's account in direct proportion to the amount of money spent by a player and confer advantages not reasonably attainable by in-game labor alone, it is most accurately classified as a "Pay to Win" mobile game.

37.     In other words, a player who spends money in the game will be more powerful in relation to players who choose not to spend money in the game. The game leverages this by bombarding players with advertisements and invitations to buy additional packs and resources whenever they reach a point in the game where their progress has stalled. The game's model is designed to create a sense of urgency around the purchase of in-game resources, and GOG further capitalizes on this sense of urgency by suggesting that purchases are limited-time offerings made available at a substantial discount.

38.     The strategies described above to induce players to spend upwards of hundreds of thousands of dollars each are a few of the many deceitful tactics, known as "dark patterns," employed within GOG. "Dark patterns" refer to "a[ny] user interface carefully crafted to trick users into doing things they might not otherwise do," causing players to "engage accidently or unwittingly in monetization activities thereby generating more income for the developer."[6]

39.     As the computer and behavioral scientist Chris Lewis[7] writes, "[t]hese dark

---

[6] Dan Fitton, Janet C. Read, *Creating a Framework to Support the Critical Consideration of Dark Design Aspects in Free-to-Play Apps*, Assoc. for Computing Machinery 407 (2019), available at https://dl.acm.org/doi/pdf/10.1145/3311927.3323136.

[7] Chris Lewis, Irresistible Apps: Motivational Design Patterns for Apps, Games, and Web-

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

patterns violate user expectations by encouraging them to give up or jeopardize some resource to an extent that they were not expecting (time, money, social capital)."[8]

40.     Indeed, and as further described below, many of GOG's tactics to induce players to spend over a billion dollars on a "free game" fall directly within the dark patterns that the FTC identified in its September 2022 report, *Bringing Dark Patterns to Light*.[9]

41.     Prior to downloading GOG, the "Pay-to-Win" nature of the game is withheld or obscured from promotional material directed at potential consumers through various social media channels.  Defendants invest in producing highly elaborate advertisements that suggest a fast-paced game with rousing visuals, many of which appear to be taken directly from other games, such as the popular strategy PC game, "Age of Empires 2."[10] The advertisements are designed to give the impression that they depict in-game footage. This, however, is false.

42.     Once a player downloads the game, they are placed automatically into a specific "Kingdom," or server, along with several thousand players who also created their accounts at a similar period in time. In stark contrast to the advertisements, a player plays by tapping on various icons of buildings surrounding a stronghold upon a mostly visually-simple, two-dimensional, and inert map.  They are immediately tasked with upgrading the level of their "Stronghold"[11] within their estate, and the buildings within it. They must do this to strengthen their combat abilities and therefore maintain a competitive position among other players in the server.

43.     The purpose of the game is to advance the strength of one's estate by upgrading buildings, recruiting and upgrading heroes, training a large number of strong

_____

based Communities (1st ed. 2014).

[8] Lewis, *supra* note 17 (internal quotations omitted).

[9] FTC Staff Report—Bringing Dark Patterns to Light.

[10] For a collection of such advertisements, *see* https://youtu.be/99yhvFeda1o (footage seemingly taken from Age of Empires: 2 appears at around 01:20).

[11] Also called a "Castle" in certain servers of the app

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

troops, and exploring the kingdom. The players join large allegiances of other players that compete for dominance within the kingdom through various in-game events.

44.   In order to progress past a certain level in the game, it is necessary to purchase in-app "packs" that contain the required items to level up one's account in the game. These essential items require spending real money, as they are otherwise only available in insufficient amounts through in-game labor alone to make upgrades feasible.

45.   After a few days of playing and regularly making upgrades, the cost to acquire the materials needed to make subsequent upgrades increases exponentially.

46.   In other words, GOG is made up of feedback loops—the output of the system becomes the input for the next iteration of the system. Every action made in the game thus gives the user access to future actions, giving users a sense of player progress and motivation.

47.   At the beginning of the game the time between input and output is immediate and allows the user to complete the next action right away. But as the user performs more actions and levels up in the game, the time between input and output increases. There comes a point in the game where the user can no longer advance due to the time required to complete the next action. At this point, without making an in-app purchase, the user is at a standstill.

48.   Because users are so accustomed to short wait times or using the speed up, skip, or coin (spending in-game resources) features, by the time this standstill occurs (that is, if no additional purchases are made) a user is predisposed to make in-app purchases.

49.   For example, to upgrade one's Stronghold to level 2 costs a trivial number of resources acquired with no labor because sufficient quantities are possessed upon account creation. The upgrade is also completed instantly with one click. But subsequent upgrade costs increase exponentially, with latter levels costing hundreds of millions—and, in some cases, *billions*—of resources. Once initiated, these latter upgrades take real-world **months** to complete, unless players purchase construction speed-up boosters. For example, after a player gathers the necessary resources to advance from Stronghold level

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  39 to 40 and clicks "upgrade," the completion time is 163 days, 19 hours, 52 minutes, and

2  43 seconds.

3      50.    If a player does not make any purchases in the game, it would require **years**

4  of playing two hours each day, 365 days a year, to gather the necessary resources to

5  upgrade their Stronghold to levels 40 and beyond.

6      51.    Defendants build off the compulsive feedback loops that their game

7  intentionally creates to induce Plaintiff and other players to spend upwards of hundreds of

8  thousands of dollars each.[12] GOG reminds players that instead of devoting countless hours

9  to progress in the game, they can simply purchase packs. The game designs these

10 upgrades to lure players into spending money on resources.

11     52.    These upgrades all cost players real money. The packs necessary for these

12 upgrades are generally offered at the following prices: $99.99, $49.99, $19.99, $9.99,

13 $4.99, $1.99, and $0.99. The advertisements for a particular pack at different pricing levels

14 usually have similar graphical advertisements but contain varying amounts of items in

15 proportion to their price.

16     53.    To acquire the resources necessary to reach Stronghold level 40, a player

17 would need to spend thousands of dollars on packs. However, this cost is never made

18 clear to the player because Defendants know that players would not be willing to pay this

19

20 [12] GOG also employs compulsion loops, a sinister-sounding term for a simple process. To
21 create a compulsion loop, game developers make users anticipate a reward, such as a
   more powerful sword or the prospect of traveling to a new game area. Next, users are
22 given a challenge, such as killing monsters or solving a puzzle. By completing the
   challenge, the user earns their anticipated reward, which in turn presents or unlocks more
23 challenges for yet more rewards (*e.g.*, the new game area includes a new quest giver).
   Compulsion loops can lead to compulsive behavior. Adrian Hon, *You've Been Played: How*
24 *Corporations, Governments, and Schools Use Games to Control Us All*, p. 144. GOG
   likewise employs treatmills, a refinement of compulsion loops, where incremental gains are
25 constantly doled out, with the intention of engaging players indefinitely. Treatmills are
   designed to ensure the game occupies an enormous amount of a user's time, stays
26 relevant as long as possible, and as a result maximizes the time where a user might refer
   the game to a friend. Games can easily consume hundreds of hours of users' time by
27 incrementally unlocking a few more secrets and a few more power-ups after every loop.
28 *Id.* at 152.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   price if they were aware of the total cost up front. After all, these are players who specifically

2   selected a free-to-play game instead of spending $20 to $60 on a traditional video game

3   that is available for one-time purchase, and with the same mechanics.

4       54.    Knowing this, Defendants instead leverage the incremental upgrade system

5   to spread this total cost over numerous separate upgrades, all while keeping consumers

6   in the dark. There is no in-game mechanism to review one's purchase history or the total

7   amount one has spent. Upgrade costs are only shown for those upgrades for which the

8   player is currently eligible, meaning Defendants hide the explosive exponential costs of in-

9   game upgrades until the game's players have already invested months of time and money

10  into the game.

11      55.    Once players are fully invested, Defendants then use packs to create a false

12  sense of urgency and scarcity to pressure players into making several dozen smaller

13  purchases over a period of days, weeks, or months.

14      56.    In other words, at no point are players told it will cost them thousands to

15  upgrade their Stronghold to level 40. Instead, they are bombarded with an endless series

16  of advertisements urgently offering limited-time sales, each providing the opportunity to

17  purchase just the incremental resources needed at the time to reach the next level of

18  upgrade.

19      57.    Defendants follow this model intentionally to foster dangerous consumer

20  behaviors that ultimately result in more purchases, at the expense of its players.

21      58.    Research into microtransactions and human behavior shows that a critical

22  link between microtransaction purchases and problem gaming behavior (*i.e.*, behavior

23  associated with gambling addiction) forms with high frequency purchases.[13] Of note, "Both

24  classical and operant conditioning theories suggest that more frequent events or quicker

25  pay out frequencies could increase the likelihood of problematic microtransaction purchase

26

27  [13] Erin Gibson et. al, *The relationship between videogame micro-transactions and problem gaming and gambling: A systematic review*, 131 Computers in Human Behavior 107219

28  (2022).

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   behavior and problem gambling symptoms through reinforcement."[14]

2      59.   Thus, by luring players into making several smaller, time-sensitive purchases

3   of purportedly high-value packs, Defendants specifically intend to foster addictive

4   behaviors by luring consumers into dangerous spending habits.

5      60.   As a result of Defendants' predatory monetization schemes and false

6   advertising, numerous players, like Plaintiff, end up spending tens of thousands—if not

7   hundreds of thousands—of dollars on GOG.

8      61.   As an editorial in the Society for the Study of Addiction has observed:

9   
10   Predatory monetization schemes in video games are purchasing systems
    that disguise or withhold the long-term cost of the activity until players are
    already financially and psychologically committed. Such schemes contribute
11   to the increasing similarity of gaming and gambling and the potential for
    financial harm for those with Internet gaming disorder.
12

13   . . .

14   Game monetization schemes have become increasingly sophisticated and
    have been featured more prominently within popular on-line games. In our
15   view, some of these schemes could be considered predatory. Predatory
    monetization schemes typically involve in-game purchasing systems that
16   disguise or withhold the true long-term cost of the activity until players are
    already financially and psychologically committed. Such schemes are
17   designed to encourage repeated player spending using tactics or elements
    that may involve, either singularly or in combination, limited disclosure of the
18   product; intrusive and unavoidable solicitations; and systems that manipulate
    reward outcomes to reinforce purchasing behaviors over skillful or strategic
19   play. Such strategies may exploit inequalities in information between
    purchaser and provider, such as when the industry uses knowledge of the
20   player's game-related preferences, available funds and/or playing and
    spending habits, to present offers predetermined to maximize the likelihood
21   of eliciting player spending.[15]
22

23      62.   Layered on top of its predatory and addictive monetization schemes, GOG

24   relies on four primary categories of deceptive pack advertisements within GOG: (a) packs

25   that offer the illusion of price discounts through the strikethrough graphics, hereafter

26   

27   _____

    [14] *Id.*

28   [15] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

referred to as "False Strikethrough Packs"; (b) packs that falsely advertise that a pack contains extra value by containing an extra percentage increase value relative to normal versions of the same pack, hereafter referred to as "False Bonus Packs"; (c) packs that falsely allege the limited availability of purchases, hereafter referred to as "False Limited Availability Packs"; and (d) items that "randomly" generate an in-game prize once purchased, hereafter referred to as "Loot Boxes." Any deceptively advertised pack can belong to more than one of these categories simultaneously or may be deceptive for a separate reason outside of the ones belonging to the four main categories.

63.     However, these advertisements are false, deceptive, and intended to mislead players into making in-app purchases that they otherwise would not have made.

64.     Defendants falsely promote these packs as being on sale or discounted by misrepresenting that such packs are currently being offered at a lower price than normal, include limited-time bonuses that purport to substantially increase the value of the packs, or have limited availability. Since the game pits players against each other, there is significant pressure on players to take advantage of these limited-time offerings so that they can gain a competitive edge against opponents who presumably are left to pay full price.

65.     Additionally, the advertisements mislead players into believing they will find themselves at a competitive *disadvantage* if they do not purchase packs now, since they will be left paying full price for items their opponents were able to purchase at a discount.

**False Strikethrough Packs**

**CLASS ACTION COMPLAINT**

66.     The False Strikethrough Packs display an advertised price for which the pack is currently offered. On the left side of the arrow graphic is a significantly higher price struck through with a red "X." The advertisements suggest that the pack was formerly offered at the higher price but is now heavily discounted.



67.     However, these packs were in fact never offered at the advertised former reference price.

68.     There are dozens of False Strikethrough Packs sold at multiple pricing tiers, including: "First Top-up Bonus" packs that purport to offer in-game resources across the $4.99, $9.99, and $19.99 pricing tiers (the last of which is labeled as "HOT" and described as "Extreme value, super deal!"). None of these packs were ever offered at the former reference prices.

69.     Defendants use false reference pricing schemes to increase sales because they know these reference prices influence purchasing decisions, as consumers want bargains. Fake discounting and false reference prices are widely recognized to be powerful tools in convincing customers to make purchases, and this issue has been studied repeatedly. As one recent research study from the Harvard Business School summarized:

> Taken together, evidence from our analysis of observational transaction data and our laboratory experiment suggests that fake prices provide sellers with a powerful tool to enhance demand, but one that may come at the expense of misleading consumers about products' true initial selling prices. Consumers take initial prices as signals of product quality and rate offers as being better deals the higher these initial prices are with respect to present

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

selling prices. Accordingly, fake prices have the highest influence on purchase likelihood for less-informed consumers.

. . .

By definition, a fake price offers a fake discount—a discount that does not represent a decrease from some previous selling price but, rather, the difference between the current selling price and a fake introductory price. There is much existing literature on the impact of discounts on consumer behavior beyond . . .[16]

70.     Defendants had actual knowledge that the False Strikethrough Packs contained false or misleading representations as to their former prices. Defendants designed and promoted these advertisements from 2017 until the present day, as the practice of offering these deceptive packs continues.

71.     The price at which a pack is obtained is a material consideration when reasonable players, including Plaintiff, decide to make purchases. Players seek to maximize the amount of items obtained from the pack for the lowest cost. Defendants deceive players into taking advantage of discounts so that players believe they may achieve a competitive advantage on the mistaken belief that other players may have to pay the substantially higher non-discounted price for the same number of items.

72.     Plaintiff and the Classes reasonably relied on the "strikethrough" pricing when purchasing numerous False Strikethrough Packs. Had Plaintiff known the "strikethrough" pricing was false, Plaintiff would not have purchased many of the False Strikethrough Packs that they purchased.

73.     If Plaintiff and the Classes could ever have reasonably realized that the False Strikethrough Packs were never sold at the original reference price, such realization would have occurred only after enough game play that Defendants would have already achieved their goal of establishing addictive spending habits. Thus, to the extent Plaintiff or any of

---

[16] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business School Working Paper (2018) (available at https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-ffba637617d9.pdf).

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

the Classes continued to make purchases after developing an understanding that the packs were never offered at the original price, this was the calculated and intended result that Defendants sought when engaging in this deceptive and unfair practice in the first place.

**False Bonus Packs**

74.     The False Bonus Packs also falsely advertise that a pack possesses extra value by containing a specific percentage increase in items or resources relative to normal versions of the same pack. The false percentage is indicated by a large and attention-grabbing bubble in the pack's graphical advertisement that contains a quantitative claim regarding the increase in value of this pack relative to packs which are not on sale.



75.     For example, the "Value Deal" pack is offered with a graphical image of a red bubble containing "7500%"—indicating to a reasonable consumer that this specific pack is discounted because it contains a 7,500% increase in the value or quantity of items contained within it when compared to a Value Deal pack without such a representation.

76.     Defendants intentionally designed the packs to mislead players into believing that the packs represented a sale value, including both a false original reference price and an illusory increase in value, to induce those players to purchase the packs. Defendants knowingly took those ordinary item packs and simply placed a percentage graphic on the ad copies without altering anything else.

77.     Defendants have been promoting these False Bonus Packs from 2017 until

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

present day, as the practice continues.

78.     Plaintiff reasonably relied on the percentage graphics on the False Bonus Packs as a material consideration in purchasing those packs. Had Plaintiff known the packs were not actually on sale in the manner represented, he would not have purchased the False Bonus Packs.

**False Limited Availability Packs**

79.     The False Limited Availability Packs indicate that a particular pack can only be purchased a finite number of times. For example, a pack might be described as a "Limited Construction Pack" with text underneath the advertisement that reads: "Only Once!" These advertisements create a sense of artificial scarcity whereby players are pressured into purchasing packs containing valuable items to enhance their accounts, ostensibly to simultaneously deprive competitors from accessing the same packs.



80.     As shown above, Defendants also use graphics indicating a "Remaining Time" during which the pack will remain available to create a false sense of scarcity with its users.

81.     However, Defendants' representations as to the scarcity of the packs are false. Other players are also able to purchase these packs even if another player buys all of the supposedly remaining packs. Furthermore, the player who purchased the False Limited Availability Pack is often offered the same pack to purchase again, especially at the $99.99 pricing tier.

82.     Similarly, Defendants attempt to lure players into bidding for items by placing urgent in-game banners that advertise "ending" auctions. Auctions are for in-game items, and players bid to purchase these in-game items using gold, the primary resource for which they pay money to acquire.

83.     These auctions, however, are likewise deceptive.

84.     While the scrolling announcement urges players to "make [their] way to the Auction House" with the promise that bidding "closes in 10 minutes," (or at 15 minutes, or 20), in actuality, if a player places a bid with less than five minutes remaining until the close of the auction, the remaining time left in the auction will be extended by five minutes.

85.     Additionally, any amounts of gold bid by players are held in reserve by the auction house until bidding has ended—even once a player has been outbid. As a result, GOG lures players with a false sense of urgency by deceiving them into believing that bidding will close imminently, then holds their resources hostage for an indeterminate amount of time: until five minutes have passed without a new bid being placed.

86.     In doing so, GOG creates a false sense of scarcity and urgency, not only in an effort to drive up the final price of the items, but to keep players from being able to access their gold, driving them to purchase more gold while they wait for their resources to be released from indefinite escrow.

87.     None of this information, however, is disclosed in the in-game banner that warns players bidding will close "in 10 minutes." Indeed, at 10 minutes, the bidding war and game of continual timer reset has not even begun, and so the banner serves primarily to ensure that as many players as possible will have their gold rendered inaccessible while the auction continues.

88.     Defendants intentionally designed the packs and auctions to mislead players into believing that they were limited in availability. Defendants knowingly added a message to players communicating an artificial scarcity to induce them to purchase the packs and bid on auction items immediately.

89.     These false and deceptive tactics of scarcity and urgency are effective dark

patterns.

90.     As the FTC explained, "SCARCITY" includes variants such as the "False Low Stock Message" (*e.g.*, "Only 1 left in stock—order soon"), which falsely claim inventory is low.  This message "[c]reate[s] pressure to buy immediately."

91.     "URGENCY" includes variants such as the "Baseless Countdown Timer" ("Offer ends in 00:59:48"), which shows a clock that goes away or resets when it times out; "False Limited Time Message" ("Deal ends soon"), which presents a meaningless deadline that resets when reached; or "False Discount Claims" ("Sale"). All of these variants create pressure to buy immediately.

92.     Plaintiff reasonably relied on the textual advertisements of supposed scarcity accompanying the ad copy as a material consideration in purchasing those packs and purchasing gold to spend on in-game auctions. Had Plaintiff known the packs were not actually scarce or limited, he would not have made such purchases.

**Loot Boxes**

93.     Amplifying the addictive features of GOG, Defendants also entice players to purchase Loot Boxes.

94.     The use of Loot Boxes within GOG and other freemium games encourages further and unregulated problem gambling behavior[17] by providing players with the opportunity to purchase items that yield randomized awards—mirroring gambling through uncertainty in the outcomes of spending.

95.     Loot Boxes allow players to purchase virtual "chances" to win rare in-game items, but most players win only common virtual items, which can often be purchased for far less than what the players spend on a "chance" at rare in-game loot.

96.     While this may sound similar to traditional gambling games, Loot Boxes

---

[17]  Matthew E. Perks, "Regulating In-Game Monetization: Implications of Regulation on Games Production," (2021), available at https://www.jstor.org/stable/pdf/j.ctv1hp5hqw.14.pdf?refreqid=excelsior%3Ae35b9894f003556c7dff9d435726e0dc&ab_segments=0%2Fbasic_search_gsv2%2Fcontrol&origin=&acceptTC=1, p. 221.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

contain only virtual items and not physical objects, and therefore are arguably not subject to laws that typically apply to gambling activities.

97.    Loot Boxes are classified as a type of "monetary dark pattern," and as such GOG, "a video game that employs loot boxes[,] is just utilizing the 'monetized rivalries' dark pattern"—the exploitation of user competitiveness which encourages players to spend money they would not otherwise spend, in order to achieve status.[18]

98.    Further, academic literature on the subjects of predatory monetization and addiction to loot-box-microtransactions suggests that there is a link between chance-based gambling and player behavior on these apps. Studies in psychology show that loot box consumption mimics gambling as it involves the betting and spending of real currency for unpredictable in-game rewards, with the ambiguity of the valuation for in-game vs. real-world currency making this a habit that is easy to fall into.[19]

99.    The similarities between gambling and Loot Boxes are especially dangerous for individuals who are already problem gamblers, as the high degree of likeness to other forms of gambling may cause them "to spend large amounts of money on buying loot boxes in games, just as they would spend large amounts of money on other forms of gambling."[20]

100.    This is particularly problematic because studies have repeatedly confirmed that problematic and pathological gambling habits develop at a higher rate among those who participate in virtual, online gambling activities.[21]

---

[18] Lewis, *supra* note 17.

[19]  Tom Brock, Mark Johnson, *The Gamblification of Digital Games*, 21 J. Consumer Culture (2021) available at https://journals.sagepub.com/doi/full/10.1177/1469540521993904.

[20] David Zendle, Paul Cairns, *Video Game Loot Boxes are Linked to Problem Gambling: Results of a Large-scale Survey*, PLOS ONE (2018), available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0206767.

[21] *See, e.g.*, Brunelle, Leclerc, Cousineau, Dufour, Gendron, & Martin, *Internet gambling, substance use, and delinquent behavior: An adolescent deviant behavior involvement pattern*, 26 Psych of Addictive Behaviors 365-70 (2012), available at https://doi.org/10.1037/a0027079.

101.   Additionally, younger individuals (those under 30 and, in particular, those under 18) are particularly susceptible to developing problematic gambling pathologies, including gambling addiction.[22]

102.   GOG, which is marketed to individuals 13 and older, leverages these predispositions to foster addiction and other pathological behaviors with its chance-based loot box system.

103.   Upon information and belief, Defendants are aware of the addictive nature of Loot Boxes and have designed GOG specifically to leverage consumer psychology in an effort to maximize consumer addiction and promote virtual gambling.

104.   In order to power-up their accounts and progress through the game's content, players must obtain "heroes," consisting of trading card like depictions of various in-game characters. These heroes provide unique abilities and bonuses to aid one's troops in succeeding in various combat scenarios. Heroes are classified into tiers within the game, with Tier A or S Heroes providing the greatest statistical advantages to a player.

105.   Players recruit heroes by way of the "Tavern," one of the buildings in a player's in-game estate. The Tavern allows players to draw hero cards by chance, from two piles: Master or Standard. The former proports to increase the odds of drawing a premium Tier S or A hero. A Tier S hero is superior to a Tier A hero.

106.   GOG employs Loot Boxes in the form of its "Tavern," where players encounter a graphical depiction of two different kinds of heroes: "Standard" and "Master," with the "Master" recruitment requiring premium items:

---

[22] *See* Kristjansdottir *et al*, *Internet gambling and problem gaming among 13 to 18 year old adolescents in Iceland*, 9 Int'l J. Mental Health & Addiction 257 (2011), available at https://doi.org/10.1007/s11469-010-9280-7; *Gainsbury et al*, The Impact of Internet Gambling on Gambling Problems: A Comparison of Moderate-Risk and Problem Internet and Non-Internet Gamblers, 27(4) Psychology of Addictive Behaviors (2013), available at https://psycnet.apa.org/fulltext/2013-05953-001.pdf.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1
2
3
4
5
6
7
8

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108



9      107.    Specifically, "Master" mode requires a player to obtain "Recruitment
10 Banners," which the game describes as being "[u]sed to Recruit Master Heroes in the
11 Tavern."
12     108.    Within the Tavern, there is no published list of odds of drawing specific
13 heroes, or a "drop rate," that is readily apparent. Instead, players must intuit that they
14 should tap on the intentionally unobtrusive "!" at the top right of each hero's portrait. Doing
15 so takes them to a screen that reveals the odds for each category of hero:



16
17
18
19
20
21
22

23     109.    As this screen reveals, players who spend real money to purchase items that
24 summon "Master-tier" heroes from the "Master" summoning screen will receive a
25 "Standard-tier" hero **most of the time**. The odds of actually obtaining a master Tier S hero
26 are only 5% and the odds of obtaining even a "Tier A" hero are only 34%—the rest are
27 "Tier B" heroes. (There are no other prizes available.)
28     110.    That fact is particularly poignant when one notes that even the most house-

Case No.                                          22                    **CLASS ACTION COMPLAINT**

friendly slot machines in the country have a payout rate of approximately 80%.[23]

**CLASS ALLEGATIONS**

111.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of himself and the following proposed "Global Class":

> All persons, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability packs, and/or Loot Boxes, and/or such subclasses as the Court may deem appropriate.

112.    Plaintiff also brings this action on behalf of the following subclass (the "California Class"):

> All persons in California, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability packs, and/or Loot Boxes and/or such subclasses as the Court may deem appropriate.

113.    Excluded from the proposed Classes are Defendants and their employees, officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and the judicial officers and their immediate family members and associated court staff assigned to this case, as well as all persons who make a timely election to be excluded from the proposed Classes.

114.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence he would use to prove those elements in individual actions alleging the same claims.

115.    This action meets all applicable standards of Fed. R. Civ. P. 23 for class certification, in that Plaintiff can demonstrate the elements delineated below.

116.    **Numerosity.** The members of the proposed Classes are so numerous and geographically dispersed that individual joinder of all proposed class members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). While Plaintiff believes that there are hundreds of thousands of members of the proposed Classes, the precise number of class members

---

[23] *See* Slot Machine Payback Statistics, American Casino Guide, *available at* https://www.americancasinoguide.com/info/slot-machine-payback-statistics.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

is unknown, but may be ascertained from Defendants' books and records. On information and belief, Defendants maintain a list of users that includes personal information for the user including their email addresses, whether they have made in-app purchases, and which in-app purchases they have made.

117.    Applying a reasonable and prudent person standard to the users of GOG under the same or similar circumstances, each user would qualify to be a class member requesting the right to cancel and obtain refunds on their in-app purchases. Any reasonable and prudent person under the same or similar circumstances wants to have the flexibility to disaffirm an in-app purchase that was made while believing that the packs they purchased were part of a sale or promotion but, in reality, were not.

118.    **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual class members. *See* Fed. R. Civ. P. 23(a)(2) and (b)(3). These include, without limitation:

   a.  Whether Defendants engaged in the conduct alleged in this Complaint;

   b.  Whether Defendants violated the applicable statutes alleged herein;

   c.  Whether Defendants designed, advertised, marketed, distributed, sold, or otherwise placed GOG into the stream of commerce in the United States;

   d.  Whether Defendants' conduct emanated from the State of California;

   e.  Whether Plaintiff and the class members are injured and harmed directly by Defendants' false advertising designed to entice users into making in-app purchases they otherwise would not have made;

   f.  Whether Plaintiff and the class members are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts; and

   g.  Whether Plaintiff and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

119.    **Typicality.** Plaintiff's claims are typical of the putative class members' claims

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    because, among other things, all such class members were comparably injured through

2    Defendants' wrongful conduct as described above. *See* Fed. R. Civ. P. 23(a)(3).

3    Defendants' creation and display of its misleading advertisements is uniform for Plaintiff

4    and class members.

5         120.   **Adequacy.** Plaintiff is an adequate proposed class representative because

6    his interests do not conflict with the interests of the other members of the proposed Classes

7    he seeks to represent, because he has retained counsel competent and experienced in

8    complex class action litigation, and because he intends to prosecute this action vigorously.

9    The interests of the proposed Classes will be fairly and adequately protected by Plaintiff

10   and his counsel. *See* Fed. R. Civ. P. 23(a)(4).

11        121.   **Declaratory and Injunctive Relief.** Defendants have acted or refused to act

12   on grounds generally applicable to Plaintiff and the other members of the proposed

13   Classes, thereby making appropriate final injunctive relief and declaratory relief, as

14   described below, with respect to the proposed Classes as a whole. *See* Fed. R. Civ. P.

15   23(b)(2). Defendants' wrongful conduct alleged herein is grounded in the creation and

16   dissemination of their pack offerings in-game, which are displayed uniformly. Plaintiff's and

17   the class members' injuries are real, immediate, and ongoing. Plaintiff and the class

18   members seek injunctive and declaratory relief from Defendants.

19        122.   **Superiority.** A class action is superior to any other available means for the

20   fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

21   encountered in the management of this class action. The damages or other financial

22   detriment suffered by Plaintiff and putative class members are relatively small compared

23   to the burden and expense that would be required to individually litigate their claims against

24   Defendants, so it would be impracticable for members of the proposed Classes to

25   individually seek redress for Defendants' wrongful conduct.

26        123.   Applying the principles of equity or balance of equities, expecting an

27   individual plaintiff who is at a disadvantage with limited resources and spending capacity,

28   and with minimal negotiating power, if any, to litigate claims against Defendants,

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  multibillion-dollar corporations that have immense resources and deep pockets, would be

2  unfair. Class actions are a necessary and essential means to provide for public interest

3  litigations with checks and balances to curtail deceptive practices by powerful private

4  corporations, including Defendants.

5      124.   There is no special interest in class members individually controlling the

6  prosecution of separate actions. And even if class members could afford individual

7  litigation, the court system could not. Individualized litigation creates a potential for

8  inconsistent or contradictory judgments, and it increases the delay and expense to all

9  parties and the court system. By contrast, the class action device presents far fewer

10  management difficulties and provides the benefits of single adjudication, economy of scale,

11  and comprehensive supervision by a single court. *See* Fed. R. Civ. P. 23(b)(3).

12  **CALIFORNIA LAW APPLIES TO ALL CLASSES**

13      125.   California's substantive laws apply to every class member, regardless of

14  where the class member resides.

15      126.   California's substantive laws may be constitutionally applied to the claims of

16  Plaintiff and the Classes under the Due Process Clause, 14th Amend. §1, and the Full

17  Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant

18  contacts, or significant aggregation of contacts, to the claims asserted by Plaintiff and all

19  class members, thereby creating state interests that ensure that the choice of California

20  state law is not arbitrary or unfair.

21      127.   FunPlus and its various operating entities were founded in California.

22  FunPlus maintains offices in California, and its co-founders and key executives reside in

23  California. On information and belief, Defendants' principal places of business are located

24  in California. FunPlus conducts substantial business in California. Therefore, California has

25  an interest in regulating Defendants' conduct under its laws.

26      128.   FunPlus's decision to reside in California and avail itself of California's laws,

27  and to engage in the challenged conduct from and emanating out of California, renders the

28  application of California law to the claims herein constitutionally permissible.

Case No.             26          **CLASS ACTION COMPLAINT**

1    129.   California is also the state from which Defendants' alleged misconduct and

2    false statements emanated. This conduct similarly injured and affected Plaintiff and all

3    other class members.

4    130.   The application of California laws to the Classes is also appropriate under

5    California's choice of law rules because California has significant contacts to the claims of

6    Plaintiff and the proposed Classes, and California has a greater interest in applying its laws

7    here than any other interested state.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Business & Professions Code §§17200 *et seq.***

**(By Plaintiff, individually and on behalf of All Classes)**

12   131.   Plaintiff incorporates by reference all allegations in this Complaint and

13   restates them as if fully set forth herein.

14   132.   The UCL defines unfair business competition to include any "unlawful, unfair

15   or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading"

16   advertising. Cal. Bus. & Prof. Code §17200.

17   133.   A business act or practice is "unlawful" under the UCL if it violates any other

18   law or regulation.

19   134.   A business act or practice is "unfair" under the UCL if the reasons,

20   justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the

21   harm to the alleged victims.

22   135.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive

23   members of the consuming public.

24   136.   Defendants have violated the "unlawful" prong under the UCL and have

25   engaged in "unfair, deceptive, untrue or misleading" advertising.

26   137.   The Federal Trade Commission Act prohibits "unfair or deceptive acts or

27   practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false

28   advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing

schemes—similar to Defendants' False Strikethrough Packs and False Bonus Packs in all

material respects—as deceptive practices that would violate the FTC Act.

138.  16 C.F.R.§233.1 states:

(a)    One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b)    A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

139.  California law also prohibits false former pricing schemes. Cal. Bus. & Prof.

Code §17501, entitled "Value determinations; Former price advertisements," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

140.   As further detailed in the Second Claim for Relief below, California's False

Advertising Law also prohibits a business from "[a]dvertising goods or services with intent

not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from

"[m]aking false or misleading statements of fact concerning reasons for, existence of, or

1  amounts of price reductions." *Id*. §(a)(13).

2      141.  Defendants' False Strikethrough Packs, False Bonus Packs, False Limited

3  Availability Packs, and Loot Boxes violate the unlawful prongs of the UCL since they violate

4  16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and

5  (a)(13).

6      142.  The False Bonus Packs misrepresent the existence of a sale whereby

7  players can allegedly purchase more items and resources from a pack than they normally

8  could for the same price.

9      143.  Defendants' use of the False Bonus Packs violates 15 U.S.C. §45(a)(1), 15

10  U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations,

11  Section 233.

12      144.  Defendants also violated and continue to violate Cal. Bus. & Prof. Code

13  §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false

14  discounts from purported former prices that were, in fact, not the prevailing market prices

15  within three months preceding the publication and dissemination of advertisements

16  containing the false former prices.

17      145.  Defendants have also violated the "unfair" prong of the UCL by falsely

18  representing that their consumers received a discount from a referenced "original" former

19  price of their False Strikethrough Packs where, in fact, Defendants set an arbitrary price

20  for the goods contained in these packs and then falsely represented the packs had ever

21  been offered for sale without their supposed discount.

22      146.  Additionally, Defendants have violated the "unfair" prong of the UCL by

23  falsely representing that their False Bonus Packs contained unique and specific increases

24  in items or resources when, in fact, they contained the same resources and in-game items

25  as they always do.

26      147.  Defendants have also violated the "unfair" prong of the UCL by engaging in

27  predatory practices designed to foster gambling addiction in consumers, in that they: (a)

28  deploy their microtransactions in a way specifically designed to ensnare players into

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

addictive spending habits; (b) falsely create a sense of urgency, scarcity, and value in order to secure addictive high frequency microtransactions, such as by deploying Loot Boxes, which exploit user competitiveness and foster addiction; and (c) use incremental cost step-ups to prevent players from realizing the true cost of the game and how much they have spent. Defendants' goals in engaging in these practices are far outweighed by the harm they cause.

148.    These acts and practices are unfair because they were likely to cause consumers to falsely believe that Defendants were offering value, discounts, or bargains from the prevailing market value or worth of the products sold that do not, in fact, exist. As a result, purchasers (including Plaintiff) reasonably understood that they were receiving valuable price reductions on purchases of in-game items. This, in turn, has induced reasonable purchasers to buy such products from Defendants that they would not have otherwise purchased.

149.    The gravity of the harm to Plaintiff and members of the Classes resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendants may have had for engaging in such deceptive acts and practices.

150.    Additionally, Defendants have violated the "fraudulent" prong of the UCL because their marketing and advertising materials included false "original" prices for their False Strikethrough Packs, and because these same materials also suggested that the offers in the False Bonus Packs and False Limited Availability Packs were unique, limited, and would no longer be available at those price points following the conclusion of its sale events. In actuality, the packs never contained the limited time deals or discounts they purported to offer.

151.    Defendants' acts and practices deceived Plaintiff and the Classes at large. Specifically, Plaintiff and the Classes relied on these misleading and deceptive representations regarding the limited-time bonuses they could expect to receive in the packs. Each of these representations and deceptions played a substantial role in Plaintiff's decisions to purchase the packs, and Plaintiff would not have done so in the absence of

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   such representations.

2      152.   Plaintiff and the Classes never received the benefit of their bargains with

3   Defendants, in that the "discounted" resources offered for sale in the packs did not give

4   them the anticipated competitive edge against their opponents. Competitors could simply

5   purchase packs at the same false sale pricing, or with the same number of items, or the

6   same pack availability, notwithstanding Defendants' representations that these were

7   limited time offers.

8      153.   Similarly, players who purchased the False Bonus Packs and the False

9   Strikethrough Packs defensively (to protect against becoming overpowered by opponents

10  whom they believed had been able to take advantage of the purportedly limited-time

11  bonuses) were deprived of the benefit of their bargains, because the threat itself was a

12  fabrication. There was never a risk of falling behind due to a player's failure to purchase

13  items at their discounted price, because the price was always discounted.

14     154.   As a result of these violations under each of the fraudulent, unfair, and

15  unlawful prongs of the UCL, Defendants have been unjustly enriched at the expense of

16  Plaintiff and members of the proposed Classes. Specifically, Defendants have been

17  unjustly enriched by obtaining revenues and profits that they would not otherwise have

18  obtained absent their false, misleading, and deceptive conduct.

19     155.   Through their unfair acts and practices, Defendants have improperly

20  obtained money from Plaintiff and the class members. As such, Plaintiff requests that this

21  Court cause Defendants to restore this money to Plaintiff and all class members, and to

22  enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future.

23  Otherwise, Plaintiff, the class members, and members of the general public may be

24  irreparably harmed and/or denied an effective and complete remedy if such an order is not

25  granted.

26  //

27  //

28  //

Case No.                                   31                      **CLASS ACTION COMPLAINT**

**SECOND CLAIM FOR RELIEF**

**Violation of California's False Advertising Law ("FAL")**

**Cal. Business & Professions Code §§17500 *et seq.***

**(By Plaintiff, individually and on behalf of All Classes)**

156.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

157.     The FAL prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

158.     Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

159.     The False Strikethrough Packs and the False Bonus Packs misrepresent the existence of a sale whereby players can allegedly purchase packs at a discounted price, or with an increased percentage of items or resources. The False Limited Availability Packs misrepresent the exclusive nature, and therefore competitive value, of the packs.

160.     Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiff and the class members. As such, Plaintiff requests that this Court cause Defendants to restore this money to Plaintiff and all class members, and to prevent Defendants from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiff, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

//

//

//

//

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**THIRD CLAIM FOR RELIEF**

**Violation of the California Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code. §§1750 *et seq.***

**(By Plaintiff, individually and on behalf of All Classes)**

161.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

162.    Plaintiff and the other class members are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

163.    Defendants are "persons" within the meaning of Cal. Civ. Code §§1761(c) and 1770, and they sell "goods or services" within the meaning of Cal. Civ. Code §§1761(a)–(b) and 1770.

164.    GOG and the in-app purchases are a "good" or "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b).

165.    Defendants have violated Cal. Civ. Code. §1770(a)(5)'s proscription against representing that goods have characteristics, uses, benefits, or quantities that they do not have. The False Limited Availability Packs represent that they have the benefit of conferring a competitive advantage, but those benefits are illusory.

166.    Defendants have violated Cal. Civ. Code. §1770(a)(9)'s proscription against advertising goods or services with intent not to sell them as advertised. The False Bonus Packs falsely advertise that a pack of goods has extra value by containing a significant increase in items or resources relative to normal versions of the same pack. The False Limited Availability Packs falsely indicate that a particular pack can only be purchased a finite number of times by competing players.

167.    Defendants have violated Cal. Civ. Code. §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts via False Strikethrough Packs, misrepresenting the existence of special sales through their False

Bonus Packs, and misrepresenting the exclusive nature, and therefore competitive value, of the packs through their False Limited Availability Packs.

168. Defendants have violated Cal. Civ. Code. §1770(a)(14)'s proscription against representing that a transaction conferred rights or obligations that it did not have. The False Limited Availability Packs falsely represent that the purchase confers the right of a competitive advantage, which it does not.

169. Defendants have violated Cal. Civ. Code. §1770(a)(16)'s proscription against representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not by misrepresenting that the purchasers have received a competitive advantage in the game by purchasing "sale" and "limited availability" items.

170. Defendants have violated Cal. Civ. Code. §1770(a)(17)'s proscription against representing that the consumer will receive an economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction, by misrepresenting that the purchaser of False Limited Availability Packs would receive an economic benefit (*i.e.*, more goods than other players) and therefore a competitive advantage as compared to players who did not take advantage of limited-availability sales. The economic benefit is contingent on other players not purchasing those same packs, but there is not actually a limited supply of packs.

171. Plaintiff and the other class members suffered actual damages as a direct and proximate result of the Defendants' actions, concealment, and/or omissions in the advertising, marketing, and promotion of their in-app purchases, in violation of the CLRA, as evidenced by the substantial sums Defendants pocketed from Plaintiff and the class members.

172. Plaintiff, on behalf of himself and the class members, demands judgment against Defendants for injunctive relief and attorney's fees.

//

//

**FOURTH CLAIM FOR RELIEF**

**Fraud**

**(By Plaintiff, individually and on behalf of All Classes)**

173.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

174.   Defendants represented to Plaintiff that various purchased packs were on sale in that they were offered at a lower price than normal, that certain packs were offered with an increased percentage of items and resources compared to their normal counterparts, and that pack purchases were only available in limited quantities.

175.   These representations were false because the packs were never offered at higher prices, the increased percentage versions of the packs were identical to their normal counterparts, the packs were not actually available in scarce quantities to other players in the State or to the individual player making the purchases, and the stated number of other players that had purchased the packs was fictitious.

176.   Defendants intentionally designed the graphical images on the advertisements to attract Plaintiff to the enticing but false claims regarding the existence of sales, item and resource bonuses, and artificial scarcity.

177.   Plaintiff reasonably relied upon the claims made in Defendants' advertisements in deciding to purchase the aforementioned packs.

178.   Upon purchasing the packs, Plaintiff was harmed because, had Plaintiff known Defendants' claims were false, he would not have made those purchases.

179.   Plaintiff's reliance on Defendants' misrepresentations in their pack advertisements was a substantial factor in causing harm to Plaintiff.

180.   Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the class members and will continue to both damage Plaintiff and the class members and deceive the public unless enjoined by this Court.

//

//

**FIFTH CLAIM FOR RELIEF**

**Unjust Enrichment**

**(By Plaintiff, individually and on behalf of All Classes)**

181.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

182.   Defendants misrepresented the value of the items or resources purchased in the False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, and/or Loot Boxes or any packs for which Plaintiff was double charged.

183.   Plaintiff spent $46.91 and cumulatively, members of the classes spent hundreds of millions on items and resources, induced by Defendants, thereby enriching Defendants.

184.   It would be unfair for Defendants to keep the money spent without compensating Plaintiff.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the proposed Classes, prays for relief and judgment against Defendants as follows:

(a)   Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Classes, and designating Plaintiff's counsel as class counsel;

(b)   Awarding Plaintiff and the class members compensatory damages and actual damages in an amount exceeding $5,000,000, to be determined by proof;

(c)   Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

(d)   For punitive damages;

(e)   For civil penalties;

(f)   For declaratory and equitable relief, including a declaration that Defendants violated and have continued to violate California's UCL, the FAL, and the CLRA, and an injunction requiring Defendants to comport with California Business & Professions Code

1 | §§17200, *et seq*., and restitution and disgorgement;

2 |     (g)    For an order enjoining Defendants from continuing to engage in the wrongful

3 | acts and practices alleged herein;

4 |     (h)    Awarding Plaintiff and the class members the costs of prosecuting this action,

5 | including expert witness fees;

6 |     (i)    Awarding Plaintiff and the class members' reasonable attorney's fees and

7 | costs as allowable by law;

8 |     (j)    Awarding Plaintiff and the class members reasonable attorney's fees

9 | pursuant to Cal. Civ. Proc. Code 1021.5, as this lawsuit seeks the enforcement of an

10 | important right affecting the public interest and satisfies the statutory requirements for an

11 | award of attorney's fees;

12 |     (k)    Awarding Plaintiff and the class members reasonable attorney's fees and

13 | costs, as well as injunctive relief, pursuant to the CLRA;

14 |     (l)    Awarding pre-judgment and post-judgment interest; and

15 |     (m)    Granting any other relief as this Court may deem just and proper.

16 |

17 | Respectfully Submitted,

18 | DATED: August 14, 2023        **KRONENBERGER ROSENFELD, LLP**

19 |

20 |     By: ___s/ Karl S. Kronenberger_____

21 |         Karl S. Kronenberger

    *Attorneys for Plaintiff and the Proposed Classes*

23 |     **POLLOCK COHEN LLP**

24 |     Raphael Janove
    rafi@pollockcohen.com

25 |     Adam Pollock
    adam@pollockcohen.com

26 |     George Krebs
    gkrebs@pollockcohen.com

27 |     111 Broadway, Ste. 1804
    New York, NY 10006

28 |     Telephone: (212) 337-5361

Case No.                   37          **CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

*pro hac vice* forthcoming

**JAY KUMAR LAW**
Jay Kumar
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903
*pro hac vice* forthcoming

*Attorneys for Plaintiff and the Proposed
Classes*

**DEMAND FOR JURY TRIAL**

Plaintiff, by and through his undersigned counsel, hereby demands a trial by jury for all questions of fact that can be decided by a jury in the above-entitled action.

Respectfully Submitted,

DATED: August 14, 2023                    **KRONENBERGER ROSENFELD, LLP**

By:  ___s/ Karl S. Kronenberger_____
          Karl S. Kronenberger

*Attorneys for Plaintiff and the Proposed Classes*