**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@kr.law
Katherine E. Hollist (*pro hac vice* forthcoming)
kate@kr.law
Leah Rosa Vulić (Bar No. 343520)
leah@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**
Raphael Janove (*pro hac vice* forthcoming)
rafi@pollockcohen.com
Adam Pollock (*pro hac vice* forthcoming)
adam@pollockcohen.com
George Krebs (*pro hac vice* forthcoming)
gkrebs@pollockcohen.com
111 Broadway, Ste. 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (*pro hac vice* forthcoming)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

*Attorneys for Plaintiff and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LOREN KELLY,** on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>**FUNPLUS INTERNATIONAL AG,** a Swiss public limited company, and **KINGSGROUP HOLDINGS,** a Cayman Islands corporation,<br><br>        Defendants. | Case No. 4:23-cv-04122-YGR<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

**TABLE OF CONTENTS**

2   PRELIMINARY STATEMENT ......................................................................................... 1

3   PARTIES................................................................................................................................ 3

4   JURISDICTION AND VENUE .......................................................................................... 8

5   DIVISIONAL ASSIGNMENT ........................................................................................... 9

6   FACTUAL ALLEGATIONS ............................................................................................... 9

7      A.  Guns of Glory: A Highly Profitable "Freemium App" ................................... 9

8      B.  Guns of Glory Game Play: Microtransactions and Feedback Loops .................. 12

9      C.  Defendants' Deceptive Pack Advertisements ...................................................... 17

10          1.  False Strikethrough Packs ........................................................... 18

11          2.  False Bonus Packs ...................................................................... 20

12          3.  False Limited Availability Packs ................................................ 21

13          4.  Loot Boxes ................................................................................ 23

14      D.  Device Takeover and Privacy Violations ............................................................ 27

15   CLASS ALLEGATIONS ..................................................................................................... 29

16   CALIFORNIA LAW APPLIES TO ALL CLASSES ....................................................... 32

17   FIRST CLAIM FOR RELIEF.............................................................................................. 33

18   SECOND CLAIM FOR RELIEF ........................................................................................ 38

19   THIRD CLAIM FOR RELIEF ............................................................................................. 39

20   FOURTH CLAIM FOR RELIEF ........................................................................................ 41

21   FIFTH CLAIM FOR RELIEF .............................................................................................. 42

22   SIXTH CLAIM FOR RELIEF ............................................................................................. 42

23   SEVENTH CLAIM FOR RELIEF ...................................................................................... 43

24   EIGHTH CLAIM FOR RELIEF.......................................................................................... 44

25   NINTH CLAIM FOR RELIEF ............................................................................................ 45

26   TENTH CLAIM FOR RELIEF ............................................................................................ 45

27   PRAYER FOR RELIEF ........................................................................................................ 46

28   DEMAND FOR JURY TRIAL............................................................................................ 48

Case No. 4:23-cv-04122-YGR

i

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  Plaintiff Loren Kelly ("Kelly" or "Plaintiff") on behalf of himself and all others similarly
2  situated, by and through his attorneys, for his First Amended Complaint against FunPlus
3  International AG and KingsGroup Holdings (collectively, "Defendants" or "FunPlus")
4  alleges, on knowledge as to his own actions, the investigation of Plaintiff's counsel, and
5  otherwise upon information and belief, as follows:

6  **PRELIMINARY STATEMENT**

7  1.  This is a class action lawsuit against FunPlus for falsely advertising price
8  discounts for in-game purchases and other deceptive and unfair business practices in its
9  mobile application game (or "app"), Guns of Glory: Lost Island ("GOG"). GOG is among
10  the highest grossing mobile strategy games across both Apple and Android devices,
11  grossing over $510 million in worldwide revenue since its 2017 launch.

12  2.  GOG has generated this half a billion dollars in revenue by offering players
13  "microtransactions"—the ability, while in the game, to make discrete in-app purchases of
14  in-game valuables necessary to level up one's account. These in-app purchases, or
15  "packs," generally range in price from $0.99 to $99.99 each.

16  3.  However, in its direct marketing to consumers (including representations
17  made at the time of purchase), FunPlus advertises false former prices to induce players
18  into believing they must act quickly to take advantage of a limited-time sale price.

19  4.  Since GOG launched in 2017 and continuing to the present day, FunPlus
20  deceives consumers by offering specific limited-time "bonuses" that purport to massively
21  discount the price of its in-game goods. It uses strikethrough pricing and percentages to
22  trick consumers into believing they are benefitting from limited-time promotions that
23  substantially increase the value of their in-game purchases, especially in relation to
24  purchases made by competing players. These purported savings are false, however,
25  because the original pricing that these ads reference are fabricated.

26  5.  These advertisements have run for years. But at no point, let alone within
27  three months of the advertised discounts, have these in-game items ever actually been
28  offered at a non-discounted price—*i.e.*, without their "limited-time" discounts. In other

1

**FIRST AMENDED CLASS ACTION
COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  words, FunPlus never sells these items at their "original" price. It offers false discounts
2  from an original price that did not exist, and its players bought packs on "sale" that were
3  the same prices they would ordinarily pay.

4      6.    Furthermore, the advertised "original" pricing does not reflect the prevailing
5  market retail pricing for these virtual in-game items, which have no real-world value and
6  whose pricing is entirely determined by FunPlus.

7      7.    The Federal Trade Commission ("FTC") describes these kinds of false former
8  pricing schemes as deceptive:

> One of the most commonly used forms of bargain advertising is to offer a
> reduction from the advertiser's own former price for an article. If the former
> price is the actual, bona fide price at which the article was offered to the
> public on a regular basis for a reasonably substantial period of time, it
> provides a legitimate basis for the advertising of a price comparison. Where
> the former price is genuine, the bargain being advertised is a true one. If, on
> the other hand, the former price being advertised is not bona fide but fictitious
> – for example, where an artificial, inflated price was established for the
> purpose of enabling the subsequent offer of a large reduction – the "bargain"
> being advertised is a false one; the purchaser is not receiving the unusual
> value he expects. In such a case, the "reduced" price is, in reality, probably
> just the seller's regular price.

16  16 C.F.R. §233.1(a).

17      8.    California statutory and regulatory law also expressly forbid such pricing
18  schemes. Specifically, Cal. Bus. & Prof. Code §17501 states:

> No price shall be advertised as a former price of any advertised thing, unless
> the alleged former price was the prevailing market price as above defined
> within three months next immediately preceding the publication of the
> advertisement or unless the date when the alleged former price did prevail is
> clearly, exactly and conspicuously stated in the advertisement.

23      9.    Defendants' tactics to induce players to spend tens, if not hundreds, of
24  thousands of dollars each on purchases fall directly within the dark patterns—manipulative
25  design practices—that the FTC identified in its September 2022 report, Bringing Dark
26  Patterns to Light.[1]

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[1] FTC Staff Report, *Bringing Dark Patterns to Light* (Sept. 14, 2022), available at
28  https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%
209.14.2022%20-%20FINAL.pdf [hereafter FTC Staff Report—Bringing Dark Patterns to

10.     As the FTC Staff Report on Dark Patterns explains, "SCARCITY," such as a "False Low Stock Message," "[c]reate[s] pressure to buy immediately by saying inventory is low when it isn't."

11.     "URGENCY," like a "Baseless Countdown Timer" or "False Limited Time Message" or "False Discount Claims," also "[c]reate[s] pressure to buy immediately."

12.     Defendants knew, or reasonably should have known, that their comparative price advertising is false, deceptive, misleading, and unlawful.

13.     Defendants have fraudulently concealed from and intentionally failed to disclose to Plaintiff and the putative class members the truth about their advertised price discounts and former prices.

14.     Through this false and deceptive marketing, advertising, and pricing scheme, FunPlus has violated California law prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading statements about the existence and amount of price reductions.

15.     The claims and issues asserted herein are governed by California state law. The State of California has the greatest interest in policing corporate conduct occurring within the State.

16.     Upon information and belief, the false advertisements and misleading statements emanated from the State of California, where FunPlus's key executives, subsidiaries, and offices are located.

17.     Plaintiff, individually and on behalf of all others similarly situated, hereby seeks restitution, injunctive relief, punitive damages, attorney's fees, and all other relief which the Court may deem appropriate.

**PARTIES**

18.     Plaintiff Loren Kelly is a resident of California. He began playing GOG in April 2023. He purchased False Strikethrough Packs, False Bonus Packs, and False Limited

Light].

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  Availability Packs (defined below) which he otherwise would not have purchased had he
2  known about the deceptive advertising which he reasonably relied upon in making those
3  purchases. He has not played GOG since in or around July, 2023.

4          19.     FunPlus was founded in Silicon Valley, California, apparently with the name
5  Halfquest, and has since gone through various iterations of names including "FunPlus" and
6  "KingsGroup". On information and belief, FunPlus has offices in San Francisco, San Mateo,
7  and Irvine, California. It purportedly moved its headquarters from Silicon Valley to Zug
8  Switzerland in December 2022.[2] Its past and/or present high-level executives are also
9  located in California, including: (a) Yitao Guan, a resident of Menlo Park and FunPlus
10  International's co-founder and Chief Technology Officer; (b) Andy Zhong a/k/a Yingwu
11  Zhong, a resident of San Francisco and co-founder and Chief Executive Officer; (c) Jeremy
12  Horn, a resident of Los Angeles and VP Head of Innovation; (d) Wei Wang, a resident of
13  Irvine and Chief Creative Officer; (e) Michael Tong, a resident of San Francisco and Chief
14  Strategy Officer; (f) James Kavanagh, a resident of Cambria, California and its former Chief
15  Financial Officer;  (g) Qi Lu, a San Francisco resident and "Founding team member" of
16  FunPlus from October 2009 to March 2018; (h) Jonathan Xu, a Belmont, California resident
17  and former CTO; and (i) Chris Petrovic, FunPlus's Chief Business Officer, and resident of
18  Sonoma, California. Other key high-level of employees also include California residents,
19  such as (k) ZeHong Yin, a San Francisco resident and Principal Architect of game
20  development; (l) Jing Xu, a Riverside, California resident and Senior Marketing Consultant;
21  (m) Eddie Hsu, a San Francisco resident and former Senior Product Manager; (n) Leanne
22  Zhu, a San Francisco resident and Tax Director; (o) Mike Ouye, a San Franscisco resident
23  and the former Vice President, Growth & General Manager; (p) Josh Burns, a San
24  Francisco resident and the Senior Director, Business Development for the North American
25  Market.

26          20.     Defendant FunPlus International AG ("FunPlus International") is a Swiss
27  _____

28  [2] https://www.20min.ch/story/darum-ist-der-state-of-survival-entwickler-nach-zug-
gezogen-797164499556

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

public limited company. FunPlus International was previously known as (i) KingsGroup Europe SA, (ii) KingsGroup International AG, and (iii) KingsGroup International SA. Its directors include Yingwu Zhong (a/k/a Andy Zhong).

21. Defendant KingsGroup Holdings is a Cayman Islands corporation. Yingwu Zhong (a/k/a Andy Zhong), a California resident, is one of its two directors. FunPlus has claimed that "KingsGroup Games is a key part of @FunPlusGames" and credits it for creating State of Survival, King of Avalon, and Guns of Glory. KingsGroup Holdings has also listed Irvine, California as its address in connection with trademark applications, such as for its registered trademark "Imagendary Studios."

22. Although the Google Play store and the Apple App Store now list FunPlus International AG as the developer of the game, Defendants have previously held out "Kingsgroup" as the game's publisher, and have even conflated Kingsgroup with FunPlus on multiple occasions on its social media pages.

23. For example, on June 20, 2022, the company posted to its official Facebook page:[3] "Guns of Glory is a game by Kingsgroups FunPlus Studio! Check out this great video to see all KingsGroup games!," before referring users to https://funplus.com to learn more:

---

[3] https://www.facebook.com/share/v/eYYY75j924HBPBJr/?mibextid=WC7FNe

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108



24.     In a separate post to the game's official Facebook page,[4] on August 28, 2023, Defendants stated that there was a login issue due to a system glitch, and encouraged players to "visit our official website at https://gog.kingsgroupgames.com for updates."[5]

---

[4] https://www.facebook.com/share/aUpu8H5M7R3wSE9z/?mibextid=WC7FNe
[5] https://www.facebook.com/100077699233326/posts/315377161062256/?mibextid=WC7

25.     Although that webpage no longer exists, at the time, it opened to a dedicated KingsGroup Guns of Glory page, one on which the logos for both KingsGroup and FunPlus appeared side by side:



26.     Until late 2022, however, neither KingsGroup nor FunPlus was even listed in the App Store or Google Play store as the app's developer; rather, that was another company, called "Century Games Publishing."

27.     The FunPlus website identifies Kingsgroup Games as "Our Studio," and describes it as a "market leading mobile game developer creating games in the strategy genre," before identifying State of Survival, King of Avalon, and Guns of Glory as three "Kingsgroup Games."[6] A video on the website, titled "FunPlus x KingsGroupGames Studio," features advertisements for all three games.

28.     In reference to one of its other titles, State of Survival, Defendants have explained to users that "KingsGroup Studio is part of the broader FunPlus group. In order to harmonize all our games and services under the FunPlus brand, we decided to update all player accounts to FunPlus."

29.     Defendants have operated through an opaque corporate structure. On information and belief, Defendants conduct business or have conducted business through—and employed the individuals listed above—through the businesses listed in the preceding paragraphs as well as (i) Funplus Interactive USA Inc. d/b/a FunPlus Interactive USA LLC, a Delaware company with its principal place of business in San Francisco, California; and (ii) Imagendary USA, LLC f/k/a FunPlus Interactive USA LLC f/k/a

FNe

[6] https://funplus.com/our-studios/kingsgroup/

1  KingsGroup USA, LLC, a Delaware company, with its principal place of business in San

2  Francisco, California; (iii) KingsGroup America AG, a Switzerland corporation; (iv)

3  KingsGroup USA, LLC, a Delaware company with its principal place of business in San

4  Mateo, California; and other various entities that use the phrases FunPlus or Kings Group,

5  such as (v) FunPlus International Ltd.; (vi) KingsGroup International AG; (vii) KingsGroup

6  International SA; (viii) KingsGroup America AG; as well as other related entities, such as

7  (ix) Xterio Stiftung, which ostensibly employs Yitao Guan,[7]  the co-founder and CEO of

8  FunPlus, who is also a California resident, and also employs Jeremy Horn, FunPlus's VP

9  of Head of Innovation who is also a California resident.

10      30.    On information and belief, Defendants' games, including State of Survival,

11  King of Avalon, and Guns of Glory, have been downloaded by numerous California

12  residents, and California gamers have made in-app purchases well in excess of millions of

13  dollars given the size of the California population, and Defendants have netted billions in

14  revenue from these games, which have been downloaded hundreds of millions of times.

15  Discovery will reveal the extent of the substantial California-based revenue Defendants

16  have made and the massive numbers of consumers in California who have downloaded

17  Defendants' games.

18      31.    Defendants are and at all relevant times were alter egos of one another, in

19  that they failed to maintain separate corporate identities, failed to observe corporate

20  formalities, and hold themselves out to the public as interchangeable.

21  **JURISDICTION AND VENUE**

22      32.    This Court has jurisdiction over this action under the Class Action Fairness

23  Act of 2005. Pursuant to 28 U.S.C. §1332(d)(2), this Court has original jurisdiction because

24  the aggregate claims of the putative class members exceed $5 million, exclusive of interest

25  and costs, and at least one of the members of the proposed classes is a citizen of a

26

27  [7] https://www.businesswire.com/news/home/20220830005332/en/Game-Publisher-and-

28  Developer-Xterio-Raises-40M-Led-by-FunPlus-FTX-Ventures-Makers-Fund-XPLA-and-
More-to-Create-the-Next-Great-Cross-platform-Web3-Franchises

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   different state than Defendants.

2       33.    This Court has personal jurisdiction over Defendants because they have

3   offices and key executives in this District, committed the tortious acts alleged herein in this

4   District, regularly conduct business in this District, and have extensive contacts with this

5   forum. Additionally, it has personal jurisdiction over Defendants because Defendants have

6   purposefully availed themselves of the California market, the claims described herein

7   involve sales made to California residents, and Defendants have purposefully targeted

8   California with their false advertisements.

9       34.    Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a

10  substantial part of the events or omissions giving rise to the claim occurred in this District.

11      35.    In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1), in

12  that all Defendants reside in this District and are subject to this Court's personal jurisdiction.

13      36.    In the alternative, venue is proper in this District under 28 U.S.C. §1391(b)(3),

14  to the extent there is no district in which an action may otherwise be brought under 28

15  U.S.C. §1391(b)(1)–(2), because Defendants are subject to this Court's personal

16  jurisdiction.

17                          **DIVISIONAL ASSIGNMENT**

18      37.    Because a substantial part of the events which give rise to Plaintiffs' claims

19  occurred in San Francisco and San Mateo counties, pursuant to Local Civil Rule 3-2, this

20  case has already been assigned to the Oakland Division through its assignment to the

21  Hon. Yvonne Gonzalez Rogers.

22                          **FACTUAL ALLEGATIONS**

23  **A.     Guns of Glory: A Highly Profitable "Freemium App"**

24      38.    GOG is a mobile application strategy game developed and operated by

25  Defendants and available on iPhone and Android devices through the Apple App Store,

26  Samsung Galaxy Store, Amazon Appstore, and Google Play platforms. GOG is a historical

27  fiction, strategy, and resource management game. Aside from the fact that the aesthetics

28  and story of the game feature guards, lords, and a player's growing estate, it otherwise

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  possesses nearly identical gameplay and monetization features to other resource

2  management games developed by Defendants, such as State of Survival, and Frost and

3  Flame: King of Avalon.

4        39.    GOG belongs to a category of apps known as "freemium" apps. A freemium

5  app is one in which users do not have to pay to commence playing a functional game—

6  the game is free to download and start playing.

7        40.    The term freemium is a misnomer, however, as users are given multiple

8  purchase opportunities, known as microtransactions or in-app purchases ("IAPs"), to

9  augment their playing experience. Users can buy in-game currency, weapons, garments,

10  and even time.

11        41.    The popularity of freemium apps featuring in-app purchases has

12  skyrocketed. In 2022, 97% of apps in the Google Play app store were free-to-download.[8]

13  Even so, in-app purchases accounted for 48.2% of mobile app earnings.[9] GOG has

14  generated over $500 million since its release.

15        42.    Because users can try the app for free, freemium apps acquire new users

16  more rapidly than purchase-to-play apps. Enabling microtransactions at various points

17  throughout game play allows users time to develop app loyalty and engagement before

18  having to pay anything. The continued microtransactions also remove the upper limit of

19  user spending.[10]

20        43.    Most of freemium app revenue is generated by big-spending "whales." In

21  2017, just 6% of customers on Apple's App Store accounted for 88% of all spending on

22  games.[11]

---

23  [8] https://www.statista.com/statistics/263797/number-of-applications-for-mobile-phones.

24  [9] https://www.businessofapps.com/guide/in-app-purchases.

25  [10] Savannah Wei Shi, et al., *From Minnows to Whales: An Empirical Study of Purchase*
26  *Behavior in Freemium Social Games*, Int'l J. of Elec. Com. (2015).

27  [11] *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 954 (N.D. Cal. 2021), *aff'd in part,*
   *rev'd in part and remanded on other grounds*, No. 21-16506, 2023 WL 3050076 (9th Cir.
28  Apr. 24, 2023).

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

44.    GOG has generated well over $500 million in revenue since its inception. It makes this revenue by offering players in-app purchases. These purchases include building material, "recruitment banners," speed-ups, and other valuables. An "in-app purchase" refers to a financial transaction initiated from within the mobile application itself. The most common form of in-app purchases is for bundled groups of resources, or "packs," generally ranging in price from $0.99 to $99.99 each.

45.    Players engage in "microtransactions" to make in-app purchases containing items that are necessary to progress their account further and maintain competitiveness with other players. This business model contrasts with that of many other popular free apps which offer only non-essential or cosmetic items for purchase. Because GOG offers in-app purchases that advance one's account in direct proportion to the amount of money spent by a player and confer advantages not reasonably attainable by in-game labor alone, it is most accurately classified as a "Pay to Win" mobile game.

46.    In other words, a player who spends money in the game will be more powerful in relation to players who choose not to spend money in the game. The game leverages this by bombarding players with advertisements and invitations to buy additional packs and resources whenever they reach a point in the game where their progress has stalled. The game's model is designed to create a sense of urgency around the purchase of in-game resources, and GOG further capitalizes on this sense of urgency by suggesting that purchases are limited-time offerings made available at a substantial discount.

47.    The tactics described above are a few of the many deceitful tactics, known as "dark patterns," employed within GOG. "Dark patterns" refer to "a[ny] user interface carefully crafted to trick users into doing things they might not otherwise do," causing players to "engage accidently or unwittingly in monetization activities thereby generating more income for the developer."[12]

---

[12] Dan Fitton, Janet C. Read, *Creating a Framework to Support the Critical Consideration of Dark Design Aspects in Free-to-Play Apps*, Assoc. for Computing Machinery 407 (2019), available at https://dl.acm.org/doi/pdf/10.1145/3311927.3323136.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

48.   As the computer and behavioral scientist Chris Lewis[13] writes, "[t]hese dark patterns violate user expectations by encouraging them to give up or jeopardize some resource to an extent that they were not expecting (time, money, social capital)."[14]

49.   Indeed, and as further described below, many of GOG's tactics to induce players to spend over a billion dollars on a "free game" fall directly within the dark patterns that the FTC identified in its September 2022 report, *Bringing Dark Patterns to Light*.[15]

50.   Prior to downloading GOG, the "Pay-to-Win" nature of the game is withheld or obscured from promotional material directed at potential consumers through various social media channels.  Defendants invest in producing highly elaborate advertisements that suggest a fast-paced game with rousing visuals, many of which appear to be taken directly from other games, such as the popular strategy PC game, "Age of Empires 2."[16] The advertisements are designed to give the impression that they depict in-game footage. This, however, is false.

**B.   Guns of Glory Game Play: Microtransactions and Feedback Loops**

51.   Once a player downloads the game, they are placed automatically into a specific "Kingdom," or server, along with several thousand players who also created their accounts at a similar period in time. In stark contrast to the advertisements, a player plays by tapping on various icons of buildings surrounding a stronghold upon a mostly visually-simple, two-dimensional, and inert map.  They are immediately tasked with upgrading the level of their "Stronghold"[17] within their estate, and the buildings within it. They must do this to strengthen their combat abilities and therefore maintain a competitive position among

---

[13] Chris Lewis, Irresistible Apps: Motivational Design Patterns for Apps, Games, and Web-based Communities (1st ed. 2014).

[14] Lewis, *supra* note 11 (internal quotations omitted).

[15] FTC Staff Report—Bringing Dark Patterns to Light.

[16] For a collection of such advertisements, *see* https://youtu.be/99yhvFeda1o (footage seemingly taken from Age of Empires: 2 appears at around 01:20).

[17] Also called a "Castle" in certain servers of the app

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1   other players in the server.

2       52.     The purpose of the game is to advance the strength of one's estate by

3   upgrading buildings, recruiting and upgrading heroes, training a large number of strong

4   troops, and exploring the kingdom. The players join large allegiances of other players that

5   compete for dominance within the kingdom through various in-game events.

6       53.     In order to progress past a certain level in the game, it is necessary to

7   purchase in-app "packs" that contain the required items to level up one's account in the

8   game. These essential items require spending real money, as they are otherwise only

9   available in insufficient amounts through in-game labor alone to make upgrades feasible.

10      54.     After a few days of playing and regularly making upgrades, the cost to

11  acquire the materials needed to make subsequent upgrades increases exponentially.

12      55.     In other words, GOG is made up of feedback loops—the output of the system

13  becomes the input for the next iteration of the system. Every action made in the game thus

14  gives the user access to future actions, giving users a sense of player progress and

15  motivation.

16      56.     At the beginning of the game the time between input and output is immediate

17  and allows the user to complete the next action right away. But as the user performs more

18  actions and levels up in the game, the time between input and output increases. There

19  comes a point in the game where the user can no longer advance due to the time required

20  to complete the next action. At this point, without making an in-app purchase, the user is

21  at a standstill.

22      57.     Because users are so accustomed to short wait times or using the speed up,

23  skip, or coin (spending in-game resources) features, by the time this standstill occurs (that

24  is, if no additional purchases are made) a user is predisposed to make in-app purchases.

25      58.     For example, to upgrade one's Stronghold to level 2 costs a trivial number of

26  resources acquired with no labor because sufficient quantities are possessed upon

27  account creation. The upgrade is also completed instantly with one click. But subsequent

28  upgrade costs increase exponentially, with latter levels costing hundreds of millions—and,

in some cases, *billions*—of resources. Once initiated, these latter upgrades take real-world **months** to complete, unless players purchase construction speed-up boosters. For example, after a player gathers the necessary resources to advance from Stronghold level 39 to 40 and clicks "upgrade," the completion time is 163 days, 19 hours, 52 minutes, and 43 seconds.

59.    If a player does not make any purchases in the game, it would require *years* of playing two hours each day, 365 days a year, to gather the necessary resources to upgrade their Stronghold to levels 40 and beyond.

60.    Defendants build off the compulsive feedback loops that their game intentionally creates to induce Plaintiff and other players to spend upwards of hundreds of thousands of dollars each.[18] GOG reminds players that instead of devoting countless hours to progress in the game, they can simply purchase packs. The game designs these upgrades to lure players into spending money on resources.

61.    These upgrades all cost players real money. The packs necessary for these upgrades are generally offered at the following prices: $99.99, $49.99, $19.99, $9.99, $4.99, $1.99, and $0.99. The advertisements for a particular pack at different pricing levels usually have similar graphical advertisements but contain varying amounts of items in proportion to their price.

---

[18] GOG also employs compulsion loops, a sinister-sounding term for a simple process. To create a compulsion loop, game developers make users anticipate a reward, such as a more powerful sword or the prospect of traveling to a new game area. Next, users are given a challenge, such as killing monsters or solving a puzzle. By completing the challenge, the user earns their anticipated reward, which in turn presents or unlocks more challenges for yet more rewards (*e.g.*, the new game area includes a new quest giver). Compulsion loops can lead to compulsive behavior. Adrian Hon, *You've Been Played: How Corporations, Governments, and Schools Use Games to Control Us All*, p. 144. GOG likewise employs treatmills, a refinement of compulsion loops, where incremental gains are constantly doled out, with the intention of engaging players indefinitely. Treatmills are designed to ensure the game occupies an enormous amount of a user's time, stays relevant as long as possible, and as a result maximizes the time where a user might refer the game to a friend. Games can easily consume hundreds of hours of users' time by incrementally unlocking a few more secrets and a few more power-ups after every loop. *Id.* at 152.

62.    To acquire the resources necessary to reach Stronghold level 40, a player would need to spend thousands of dollars on packs. However, this cost is never made clear to the player because Defendants know that players would not be willing to pay this price if they were aware of the total cost up front. After all, these are players who specifically selected a free-to-play game instead of spending $20 to $60 on a traditional video game that is available for one-time purchase, and with the same mechanics.

63.    Knowing this, Defendants instead leverage the incremental upgrade system to spread this total cost over numerous separate upgrades, all while keeping consumers in the dark. There is no in-game mechanism to review one's purchase history or the total amount one has spent. Upgrade costs are only shown for those upgrades for which the player is currently eligible, meaning Defendants hide the explosive exponential costs of in-game upgrades until the game's players have already invested months of time and money into the game.

64.    Once players are fully invested, Defendants then use packs to create a false sense of urgency and scarcity to pressure players into making several dozen smaller purchases over a period of days, weeks, or months.

65.    In other words, at no point are players told it will cost them thousands to upgrade their Stronghold to level 40. Instead, they are bombarded with an endless series of advertisements urgently offering limited-time sales, each providing the opportunity to purchase just the incremental resources needed at the time to reach the next level of upgrade.

66.    Defendants follow this model intentionally to foster dangerous consumer behaviors that ultimately result in more purchases, at the expense of its players.

67.    Research into microtransactions and human behavior shows that a critical link between microtransaction purchases and problem gaming behavior (*i.e.*, behavior associated with gambling addiction) forms with high frequency purchases.[19] Of note, "Both

---

[19] Erin Gibson et. al, *The relationship between videogame micro-transactions and problem gaming and gambling: A systematic review*, 131 Computers in Human Behavior 107219

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   classical and operant conditioning theories suggest that more frequent events or quicker

2   pay out frequencies could increase the likelihood of problematic microtransaction purchase

3   behavior and problem gambling symptoms through reinforcement."[20]

4   68.    Thus, by luring players into making several smaller, time-sensitive purchases

5   of purportedly high-value packs, Defendants specifically intend to foster addictive

6   behaviors by luring consumers into dangerous spending habits.

7   69.    As a result of Defendants' predatory monetization schemes and false

8   advertising, numerous players spend tens of thousands—if not hundreds of thousands—

9   of dollars on GOG.

10   70.    As an editorial in the Society for the Study of Addiction has observed:

11   Predatory monetization schemes in video games are purchasing systems
     that disguise or withhold the long-term cost of the activity until players are
12   already financially and psychologically committed. Such schemes contribute
     to the increasing similarity of gaming and gambling and the potential for
13   financial harm for those with Internet gaming disorder.

14
15   . . .

16   Game monetization schemes have become increasingly sophisticated and
     have been featured more prominently within popular on-line games. In our
17   view, some of these schemes could be considered predatory. Predatory
     monetization schemes typically involve in-game purchasing systems that
18   disguise or withhold the true long-term cost of the activity until players are
     already financially and psychologically committed. Such schemes are
19   designed to encourage repeated player spending using tactics or elements
     that may involve, either singularly or in combination, limited disclosure of the
20   product; intrusive and unavoidable solicitations; and systems that manipulate
     reward outcomes to reinforce purchasing behaviors over skillful or strategic
21   play. Such strategies may exploit inequalities in information between
     purchaser and provider, such as when the industry uses knowledge of the
22   player's game-related preferences, available funds and/or playing and
     spending habits, to present offers predetermined to maximize the likelihood
23   of eliciting player spending.[21]

24
25   _____

26   (2022).

27   [20] *Id.*

28   [21] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1        **C.    Defendants' Deceptive Pack Advertisements**

2        71.    Building off of its predatory and addictive monetization schemes, GOG relies

3   on four primary categories of deceptive pack advertisements within GOG: (a) packs that

4   offer the illusion of price discounts through the strikethrough graphics, hereafter referred

5   to as "False Strikethrough Packs"; (b) packs that falsely advertise that a pack contains

6   extra value by containing an extra percentage increase value relative to normal versions

7   of the same pack, hereafter referred to as "False Bonus Packs"; (c) packs that falsely allege

8   the limited availability of purchases, hereafter referred to as "False Limited Availability

9   Packs"; and (d) items that "randomly" generate an in-game prize once purchased, hereafter

10  referred to as "Loot Boxes." Any deceptively advertised pack can belong to more than one

11  of these categories simultaneously or may be deceptive for a separate reason outside of

12  the ones belonging to the four main categories.

13       72.    However, these advertisements are false, deceptive, and intended to mislead

14  players into making in-app purchases that they otherwise would not have made.

15       73.    Defendants falsely promote these packs as being on sale or discounted by

16  misrepresenting that such packs are currently being offered at a lower price than normal,

17  include limited-time bonuses that purport to substantially increase the value of the packs,

18  or have limited availability. Since the game pits players against each other, there is

19  significant pressure on players to take advantage of these limited-time offerings so that

20  they can gain a competitive edge against opponents who presumably are left to pay full

21  price.

22       74.    Additionally, the advertisements mislead players into believing they will find

23  themselves at a competitive *disadvantage* if they do not purchase packs now, since they

24  will be left paying full price for items their opponents were able to purchase at a discount.

25  //

26  //

27  //

28  //

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1

**1. False Strikethrough Packs**

2    75.    The False Strikethrough Packs display an advertised price for which the pack

3  is currently offered. On the left side of the arrow graphic is a significantly higher price struck

4  through with a red "X." The advertisements suggest that the pack was formerly offered at

5  the higher price but is now heavily discounted.

6



13    76.    However, these packs were in fact never offered at the advertised former

14  reference price.

15    77.    There are dozens of False Strikethrough Packs sold at multiple pricing tiers,

16  including: "First Top-up Bonus" packs that purport to offer in-game resources across the

17  $4.99, $9.99, and $19.99 pricing tiers (the last of which is labeled as "HOT" and described

18  as "Extreme value, super deal!"). None of these packs were ever offered at the former

19  reference prices.

20    78.    Defendants use false reference pricing schemes to increase sales because

21  they know these reference prices influence purchasing decisions, as consumers want

22  bargains. Fake discounting and false reference prices are widely recognized to be powerful

23  tools in convincing customers to make purchases, and this issue has been studied

24  repeatedly. As one recent research study from the Harvard Business School summarized:

25

26        Taken together, evidence from our analysis of observational transaction data
          and our laboratory experiment suggests that fake prices provide sellers with
27        a powerful tool to enhance demand, but one that may come at the expense
          of misleading consumers about products' true initial selling prices.
28        Consumers take initial prices as signals of product quality and rate offers as

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

being better deals the higher these initial prices are with respect to present selling prices. Accordingly, fake prices have the highest influence on purchase likelihood for less-informed consumers.

. . .

By definition, a fake price offers a fake discount—a discount that does not represent a decrease from some previous selling price but, rather, the difference between the current selling price and a fake introductory price. There is much existing literature on the impact of discounts on consumer behavior beyond . . .[22]

79.   Defendants had actual knowledge that the False Strikethrough Packs contained false or misleading representations as to their former prices. Defendants designed and promoted these advertisements from 2017 until the present day, as the practice of offering these deceptive packs continues.

80.   The price at which a pack is obtained is a material consideration when reasonable players, including Plaintiff, decide to make purchases. Players seek to maximize the amount of items obtained from the pack for the lowest cost. Defendants deceive players into taking advantage of discounts so that players believe they may achieve a competitive advantage on the mistaken belief that other players may have to pay the substantially higher non-discounted price for the same number of items.

81.   Plaintiff and the Classes reasonably relied on the "strikethrough" pricing when purchasing numerous False Strikethrough Packs. Had Plaintiff known the "strikethrough" pricing was false, Plaintiff would not have purchased many of the False Strikethrough Packs that they purchased.

82.   If Plaintiff and the Classes could ever have reasonably realized that the False Strikethrough Packs were never sold at the original reference price, such realization would have occurred only after enough game play that Defendants would have already achieved their goal of establishing addictive spending habits. Thus, to the extent Plaintiff or any of

---

[22] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business School Working Paper (2018) (available at https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-ffba637617d9.pdf).

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  the Classes continued to make purchases after developing an understanding that the
2  packs were never offered at the original price, this was the calculated and intended result
3  that Defendants sought when engaging in this deceptive and unfair practice in the first
4  place.

5      **2. False Bonus Packs**

6      83.    The False Bonus Packs also falsely advertise that a pack possesses extra
7  value by containing a specific percentage increase in items or resources relative to normal
8  versions of the same pack. The false percentage is indicated by a large and attention-
9  grabbing bubble in the pack's graphical advertisement that contains a quantitative claim
10  regarding the increase in value of this pack relative to packs which are not on sale.



19      84.    For example, the "Value Deal" pack is offered with a graphical image of a red
20  bubble containing "7500%"—indicating to a reasonable consumer that this specific pack is
21  discounted because it contains a 7,500% increase in the value or quantity of items
22  contained within it when compared to a Value Deal pack without such a representation.

23      85.    Defendants intentionally designed the packs to mislead players into believing
24  that the packs represented a sale value, including both a false original reference price and
25  an illusory increase in value, to induce those players to purchase the packs. Defendants
26  knowingly took those ordinary item packs and simply placed a percentage graphic on the
27  ad copies without altering anything else.

28      86.    Defendants have been promoting these False Bonus Packs from 2017 until

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1     present day, as the practice continues.

2         87.     Plaintiff reasonably relied on the percentage graphics on the False Bonus

3 Packs as a material consideration in purchasing those packs. Had Plaintiff known the

4 packs were not actually on sale in the manner represented, he would not have purchased

5 the False Bonus Packs.

6        **3. False Limited Availability Packs**

7         88.     The False Limited Availability Packs indicate that a particular pack can only

8 be purchased a finite number of times. For example, a pack might be described as a

9 "Limited Construction Pack" with text underneath the advertisement that reads: "Only

10 Once!" These advertisements create a sense of artificial scarcity whereby players are

11 pressured into purchasing packs containing valuable items to enhance their accounts,

12 ostensibly to simultaneously deprive competitors from accessing the same packs.



21         89.     As shown above, Defendants also use graphics indicating a "Remaining

22 Time" during which the pack will remain available to create a false sense of scarcity with

23 its users.

24         90.     However, Defendants' representations as to the scarcity of the packs are

25 false. Other players are also able to purchase these packs even if another player buys all

26 of the supposedly remaining packs. Furthermore, the player who purchased the False

27 Limited Availability Pack is often offered the same pack to purchase again, especially at

28 the $99.99 pricing tier.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

91.    Similarly, Defendants attempt to lure players into bidding for items by placing urgent in-game banners that advertise "ending" auctions. Auctions are for in-game items, and players bid to purchase these in-game items using gold, the primary resource for which they pay money to acquire.

92.    These auctions, however, are likewise deceptive.

93.    While the scrolling announcement urges players to "make [their] way to the Auction House" with the promise that bidding "closes in 10 minutes," (or at 15 minutes, or 20), in actuality, if a player places a bid with less than five minutes remaining until the close of the auction, the remaining time left in the auction will be extended by five minutes.

94.    Additionally, any amounts of gold bid by players are held in reserve by the auction house until bidding has ended—even once a player has been outbid. As a result, GOG lures players with a false sense of urgency by deceiving them into believing that bidding will close imminently, then holds their resources hostage for an indeterminate amount of time: until five minutes have passed without a new bid being placed.

95.    In doing so, GOG creates a false sense of scarcity and urgency, not only in an effort to drive up the final price of the items, but to keep players from being able to access their gold, driving them to purchase more gold while they wait for their resources to be released from indefinite escrow.

96.    None of this information, however, is disclosed in the in-game banner that warns players bidding will close "in 10 minutes." Indeed, at 10 minutes, the bidding war and game of continual timer reset has not even begun, and so the banner serves primarily to ensure that as many players as possible will have their gold rendered inaccessible while the auction continues.

97.    Defendants intentionally designed the packs and auctions to mislead players into believing that they were limited in availability. Defendants knowingly added a message to players communicating an artificial scarcity to induce them to purchase the packs and bid on auction items immediately.

98.    These false and deceptive tactics of scarcity and urgency are effective dark

22

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

patterns.

99.     As the FTC explained, "SCARCITY" includes variants such as the "False Low Stock Message" (*e.g.*, "Only 1 left in stock—order soon"), which falsely claim inventory is low.  This message "[c]reate[s] pressure to buy immediately."

100.    "URGENCY" includes variants such as the "Baseless Countdown Timer" ("Offer ends in 00:59:48"), which shows a clock that goes away or resets when it times out; "False Limited Time Message" ("Deal ends soon"), which presents a meaningless deadline that resets when reached; or "False Discount Claims" ("Sale"). All of these variants create pressure to buy immediately.

101.    Plaintiff reasonably relied on the textual advertisements of supposed scarcity accompanying the ad copy as a material consideration in purchasing those packs and purchasing gold to spend on in-game auctions. Had Plaintiff known the packs were not actually scarce or limited, he would not have made such purchases.

**4.  Loot Boxes**

102.    Amplifying the addictive features of GOG, Defendants also entice players to purchase Loot Boxes.

103.    The use of Loot Boxes within GOG and other freemium games encourages further and unregulated problem gambling behavior[23] by providing players with the opportunity to purchase items that yield randomized awards—mirroring gambling through uncertainty in the outcomes of spending.

104.    Loot Boxes allow players to purchase virtual "chances" to win rare in-game items, but most players win only common virtual items, which can often be purchased for far less than what the players spend on a "chance" at rare in-game loot.

105.    While this may sound similar to traditional gambling games, Loot Boxes

---

[23]  Matthew E. Perks, "Regulating In-Game Monetization: Implications of Regulation on Games Production," (2021), available at https://www.jstor.org/stable/pdf/j.ctv1hp5hqw.14.pdf?refreqid=excelsior%3Ae35b9894f003556c7dff9d435726e0dc&ab_segments=0%2Fbasic_search_gsv2%2Fcontrol&origin=&acceptTC=1, p. 221.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

contain only virtual items and not physical objects, and therefore are arguably not subject to laws that typically apply to gambling activities.

106.   Loot Boxes are classified as a type of "monetary dark pattern," and as such GOG, "a video game that employs loot boxes[,] is just utilizing the 'monetized rivalries' dark pattern"—the exploitation of user competitiveness which encourages players to spend money they would not otherwise spend, in order to achieve status.[24]

107.   Further, academic literature on the subjects of predatory monetization and addiction to loot-box-microtransactions suggests that there is a link between chance-based gambling and player behavior on these apps. Studies in psychology show that loot box consumption mimics gambling as it involves the betting and spending of real currency for unpredictable in-game rewards, with the ambiguity of the valuation for in-game vs. real-world currency making this a habit that is easy to fall into.[25]

108.   The similarities between gambling and Loot Boxes are especially dangerous for individuals who are already problem gamblers, as the high degree of likeness to other forms of gambling may cause them "to spend large amounts of money on buying loot boxes in games, just as they would spend large amounts of money on other forms of gambling."[26]

109.   This is particularly problematic because studies have repeatedly confirmed that problematic and pathological gambling habits develop at a higher rate among those who participate in virtual, online gambling activities.[27]

---

[24] Lewis, *supra* note 11.

[25]  Tom Brock, Mark Johnson, *The Gamblification of Digital Games*, 21 J. Consumer Culture (2021) available at https://journals.sagepub.com/doi/full/10.1177/1469540521993904.

[26] David Zendle, Paul Cairns, *Video Game Loot Boxes are Linked to Problem Gambling: Results of a Large-scale Survey*, PLOS ONE (2018), available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0206767.

[27] *See, e.g.*, Brunelle, Leclerc, Cousineau, Dufour, Gendron, & Martin, *Internet gambling, substance use, and delinquent behavior: An adolescent deviant behavior involvement pattern*, 26 Psych of Addictive Behaviors 365-70 (2012), available at https://doi.org/10.1037/a0027079.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    110.   Additionally, younger individuals (those under 30 and, in particular, those

2 under 18) are particularly susceptible to developing problematic gambling pathologies,

3 including gambling addiction.[28]

4    111.   GOG, which is marketed to individuals 13 and older, leverages these

5 predispositions to foster addiction and other pathological behaviors with its chance-based

6 loot box system.

7    112.   Upon information and belief, Defendants are aware of the addictive nature of

8 Loot Boxes and have designed GOG specifically to leverage consumer psychology in an

9 effort to maximize consumer addiction and promote virtual gambling.

10    113.   In order to power-up their accounts and progress through the game's

11 content, players must obtain "heroes," consisting of trading card like depictions of various

12 in-game characters. These heroes provide unique abilities and bonuses to aid one's troops

13 in succeeding in various combat scenarios. Heroes are classified into tiers within the game,

14 with Tier A or S Heroes providing the greatest statistical advantages to a player.

15    114.   Players recruit heroes by way of the "Tavern," one of the buildings in a

16 player's in-game estate. The Tavern allows players to draw hero cards by chance, from

17 two piles: Master or Standard. The former proports to increase the odds of drawing a

18 premium Tier S or A hero. A Tier S hero is superior to a Tier A hero.

19    115.   GOG employs Loot Boxes in the form of its "Tavern," where players

20 encounter a graphical depiction of two different kinds of heroes: "Standard" and "Master,"

21 with the "Master" recruitment requiring premium items:

22

23

24

---

25 [28] *See* Kristjansdottir *et al*, *Internet gambling and problem gaming among 13 to 18 year old*

26 *adolescents in Iceland*, 9 Int'l J. Mental Health & Addiction 257 (2011), available at

https://doi.org/10.1007/s11469-010-9280-7; *Gainsbury et al*, The Impact of Internet

27 Gambling on Gambling Problems: A Comparison of Moderate-Risk and Problem Internet

and Non-Internet Gamblers, 27(4) Psychology of Addictive Behaviors (2013), available at

28 https://psycnet.apa.org/fulltext/2013-05953-001.pdf.



116.    Specifically, "Master" mode requires a player to obtain "Recruitment Banners," which the game describes as being "[u]sed to Recruit Master Heroes in the Tavern."

117.    Within the Tavern, there is no published list of odds of drawing specific heroes, or a "drop rate," that is readily apparent. Instead, players must intuit that they should tap on the intentionally unobtrusive "!" at the top right of each hero's portrait. Doing so takes them to a screen that reveals the odds for each category of hero:



118.    As this screen reveals, players who spend real money to purchase items that summon "Master-tier" heroes from the "Master" summoning screen will receive a "Standard-tier" hero **most of the time**. The odds of actually obtaining a master Tier S hero are only 5% and the odds of obtaining even a "Tier A" hero are only 34%—the rest are "Tier B" heroes. (There are no other prizes available.)

119.    That fact is particularly poignant when one notes that even the most house-

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    friendly slot machines in the country have a payout rate of approximately 80%.[29]

2        **D.    Device Takeover and Privacy Violations**

3    120.    As though the various false advertisements present in the game were not

4    sufficient to infringe on consumers' rights, Defendants employ one additional, particularly

5    insidious mechanism for not only tracking and monitoring player activity, but turning

6    players' own devices against them.

7    121.    Throughout the relevant time period, whenever a player installed GOG on

8    their phone, unbeknownst to the player, Defendants began monitoring their user data in

9    ways which it failed to disclose or obtain permission for.

10   122.    In the Google Play Store and Apple App Store, Defendants represent to

11   users that there is "no data shared with third parties" and "no data collected" with respect

12   to GOG.

13   123.    However, this is not true.

14   124.    Defendants, in fact, collect a wealth of data about users, but take steps to

15   conceal this fact from their players.

16   125.    Perusing the game folder on one's phone does not reveal any record of these

17   surreptitious data-collection methods.

18   126.    However, upon information and belief, this is because Defendants

19   specifically hide this evidence from being visible to players, not because the evidence does

20   not exist.

21   127.    Upon information and belief, a file (agorasdk.log) is added to the phone

22   directory on the date when the user first installs GOG. If the user subsequently deletes

23   GOG, this file remains on the phone, and reinstallations result in the creation of new

24   iterations of this file (e.g. "agorasdk_1.log").

25   128.    These logfiles reveal that not only were Defendants collecting user data, but

26   these efforts were extensive, intrusive, and entirely at odds with their representations to

27   ───────────────
     [29] *See* Slot Machine Payback Statistics, American Casino Guide, *available at*
28   https://www.americancasinoguide.com/info/slot-machine-payback-statistics.

Case No. 4:23-cv-04122-YGR                    **FIRST AMENDED CLASS ACTION**
                                              **COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    users that they do not collect **any** such data.

2        129.    Not only do these logfiles suggest that Defendants gather analytics to share

3    with third parties, but they suggest that Defendants actually **create audio and video**

4    **recordings without players' knowledge or consent**.

5        130.    To give just a few examples of the sorts of entries contained in the logfiles

6    that have been discovered for one of Defendants' other game titles, State of Survival:

7            a. Entries initiating a "remote render" for an "incoming video stream," then

8                detailing when the first frame arrives for to commence the "remote stream,"

9                and confirming that "local video" has been enabled;

10           b. Entries noting "audio routing changed to speakerphone;"

11           c. Entries detailing efforts "to enable video;"

12           d. Entries detailing efforts to have the resulting files "store[d] for FunPlus;" and

13           e. Entries indicating the transmittal of data across various IP international

14                addresses from around the world.

15       131.    In other words, Defendants have not only collected data about players

16   without their knowledge or consent (and in the face of promises to the contrary by

17   Defendants), but they have also transmitted players' data to unknown third parties, as

18   these logfiles demonstrate.

19       132.    State of Survival and GOG are substantially similar games, utilizing almost

20   all of the same mechanics, engines, etc., but using a different theme.

21       133.    The way the games operate, monetize, present to users, etc. are functionally

22   identical. Defendants purport to use a single set of website terms and conditions for both

23   games.

24       134.    Upon information and belief, Defendants have employed the same

25   surveillance tactics for Plaintiff and the putative class as they have for players of State of

26   Survival. As here, players of State of Survival were unable to locate any logfiles initially.

27   Due to Defendants' efforts to conceal these documents, it took players a significant amount

28   of time to discover where the logfiles had been hidden.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

135.   Defendants attempted to hide these logfiles from users so that users would not be aware of what they had done, making them inaccessible to all but the most tech-savvy of users.

136.   Upon information and belief, Defendants have utilized the same tactics here with respect to gathering consumer data that they used in State of Survival.

137.   In summary, Defendants have violated Plaintiff's rights to data privacy, have effectively caused Plaintiff's own device to spy on him, and have attempted to conceal their wrongful conduct in an effort to evade detection and to allow them to continue to collect data from unsuspecting users.

138.   Upon information and belief, Defendants violated the privacy rights by surreptitiously tracking, recording, and transmitting data about all players who have played GOG during the applicable time period; accordingly, each and every Plaintiff and putative class member has also suffered invasions of privacy.

## CLASS ALLEGATIONS

139.   Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of himself and the following proposed "Global Class":

> All persons, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability packs, and/or Loot Boxes, and/or such subclasses as the Court may deem appropriate.

140.   Plaintiff also brings this action on behalf of the following subclass (the "California Class"):

> All persons in California, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability packs, and/or Loot Boxes and/or such subclasses as the Court may deem appropriate.

141.   Excluded from the proposed Classes are Defendants and their employees, officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and the judicial officers and their immediate family members and associated court staff assigned to this case, as well as all persons who make a timely election to be excluded from the proposed Classes.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

142.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence he would use to prove those elements in individual actions alleging the same claims.

143.   This action meets all applicable standards of Fed. R. Civ. P. 23 for class certification, in that Plaintiff can demonstrate the elements delineated below.

144.   **Numerosity.** The members of the proposed Classes are so numerous and geographically dispersed that individual joinder of all proposed class members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). While Plaintiff believes that there are hundreds of thousands of members of the proposed Classes, the precise number of class members is unknown, but may be ascertained from Defendants' books and records. On information and belief, Defendants maintain a list of users that includes personal information for the user including their email addresses, whether they have made in-app purchases, and which in-app purchases they have made.

145.   Applying a reasonable and prudent person standard to the users of GOG under the same or similar circumstances, each user would qualify to be a class member requesting the right to cancel and obtain refunds on their in-app purchases. Any reasonable and prudent person under the same or similar circumstances wants to have the flexibility to disaffirm an in-app purchase that was made while believing that the packs they purchased were part of a sale or promotion but, in reality, were not.

146.   **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual class members. *See* Fed. R. Civ. P. 23(a)(2) and (b)(3). These include, without limitation:

    a. Whether Defendants engaged in the conduct alleged in this First Amended First Amended Complaint;

    b. Whether Defendants violated the applicable statutes alleged herein;

    c. Whether Defendants designed, advertised, marketed, distributed, sold, or otherwise placed GOG into the stream of commerce in the United States;

d. Whether Defendants' conduct emanated from the State of California;

e. Whether Plaintiff and the class members are injured and harmed directly by Defendants' false advertising designed to entice users into making in-app purchases they otherwise would not have made;

f. Whether Plaintiff and the class members are entitled to damages due to Defendants' conduct as alleged in this First Amended Complaint, and if so, in what amounts; and

g. Whether Plaintiff and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this First Amended Complaint.

147. **Typicality.** Plaintiff's claims are typical of the putative class members' claims because, among other things, all such class members were comparably injured through Defendants' wrongful conduct as described above. *See* Fed. R. Civ. P. 23(a)(3). Defendants' creation and display of its misleading advertisements is uniform for Plaintiff and class members.

148. **Adequacy.** Plaintiff is an adequate proposed class representative because his interests do not conflict with the interests of the other members of the proposed Classes he seeks to represent, because he has retained counsel competent and experienced in complex class action litigation, and because he intends to prosecute this action vigorously. The interests of the proposed Classes will be fairly and adequately protected by Plaintiff and his counsel. *See* Fed. R. Civ. P. 23(a)(4).

149. **Declaratory and Injunctive Relief.** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the proposed Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the proposed Classes as a whole. *See* Fed. R. Civ. P. 23(b)(2). Defendants' wrongful conduct alleged herein is grounded in the creation and dissemination of their pack offerings in-game, which are displayed uniformly. Plaintiff's and the class members' injuries are real, immediate, and ongoing. Plaintiff and the class

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

members seek injunctive and declaratory relief from Defendants.

150.   **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Classes to individually seek redress for Defendants' wrongful conduct.

151.   Applying the principles of equity or balance of equities, expecting an individual plaintiff who is at a disadvantage with limited resources and spending capacity, and with minimal negotiating power, if any, to litigate claims against Defendants, multibillion-dollar corporations that have immense resources and deep pockets, would be unfair. Class actions are a necessary and essential means to provide for public interest litigations with checks and balances to curtail deceptive practices by powerful private corporations, including Defendants.

152.   There is no special interest in class members individually controlling the prosecution of separate actions. And even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. *See* Fed. R. Civ. P. 23(b)(3).

### CALIFORNIA LAW APPLIES TO ALL CLASSES

153.   California's substantive laws apply to every class member, regardless of where the class member resides.

154.   California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Classes under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   contacts, or significant aggregation of contacts, to the claims asserted by Plaintiff and all

2   class members, thereby creating state interests that ensure that the choice of California

3   state law is not arbitrary or unfair.

4        155.   FunPlus and its various operating entities were founded in California.

5   FunPlus maintains offices in California, and its co-founders and key executives reside in

6   California. On information and belief, Defendants' principal places of business are located

7   in California. FunPlus conducts substantial business in California. Therefore, California has

8   an interest in regulating Defendants' conduct under its laws.

9        156.   FunPlus's decision to reside in California and avail itself of California's laws,

10   and to engage in the challenged conduct from and emanating out of California, renders the

11   application of California law to the claims herein constitutionally permissible.

12        157.   California is also the state from which Defendants' alleged misconduct and

13   false statements emanated. This conduct similarly injured and affected Plaintiff and all

14   other class members.

15        158.   The application of California laws to the Classes is also appropriate under

16   California's choice of law rules because California has significant contacts to the claims of

17   Plaintiff and the proposed Classes, and California has a greater interest in applying its laws

18   here than any other interested state.

19                        **FIRST CLAIM FOR RELIEF**

20            **Violation of California's Unfair Competition Law ("UCL")**

21               **Cal. Business & Professions Code §§17200 *et seq.***

22             **(By Plaintiff, individually and on behalf of All Classes)**

23        159.   Plaintiff incorporates by reference all allegations in this First Amended

24   Complaint and restates them as if fully set forth herein.

25        160.   The UCL defines unfair business competition to include any "unlawful, unfair

26   or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading"

27   advertising. Cal. Bus. & Prof. Code §17200.

28        161.   A business act or practice is "unlawful" under the UCL if it violates any other

1  law or regulation.

2       162.   A business act or practice is "unfair" under the UCL if the reasons,

3  justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the

4  harm to the alleged victims.

5       163.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive

6  members of the consuming public.

7       164.   Defendants have violated the "unlawful" prong under the UCL and have

8  engaged in "unfair, deceptive, untrue or misleading" advertising.

9       165.   The Federal Trade Commission Act prohibits "unfair or deceptive acts or

10 practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false

11 advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing

12 schemes—similar to Defendants' False Strikethrough Packs and False Bonus Packs in all

13 material respects—as deceptive practices that would violate the FTC Act.

14      166.   16 C.F.R.§233.1 states:

15 (a)    One of the most commonly used forms of bargain advertising is to offer a
   reduction from the advertiser's own former price for an article. If the former price is
16 the actual, bona fide price at which the article was offered to the public on a regular
   basis for a reasonably substantial period of time, it provides a legitimate basis for
17 the advertising of a price comparison. Where the former price is genuine, the
   bargain being advertised is a true one. If, on the other hand, the former price being
18 advertised is not bona fide but fictitious—for example, where an artificial, inflated
   price was established for the purpose of enabling the subsequent offer of a large
19 reduction—the "bargain" being advertised is a false one; the purchaser is not
   receiving the unusual value he expects. In such a case, the "reduced" price is, in
20 reality, probably just the seller's regular price.
   (b)    A former price is not necessarily fictitious merely because no sales at the
21 advertised price were made. The advertiser should be especially careful, however,
   in such a case, that the price is one at which the product was openly and actively
22 offered for sale, for a reasonably substantial period of time, in the recent, regular
   course of his business, honestly and in good faith—and, of course, not for the
23 purpose of establishing a fictitious higher price on which a deceptive comparison
   might be based. And the advertiser should scrupulously avoid any implication that
24 a former price is a selling, not an asking price (for example, by use of such language
   as, "Formerly sold at $_____"), unless substantial sales at that price were actually
25 made.

26      167.   California law also prohibits false former pricing schemes. Cal. Bus. & Prof.

27

28 Code §17501, entitled "Value determinations; Former price advertisements," states:

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1
2
3

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

4
5
6

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

7
8
9
10
11

168.   As further detailed in the Second Claim for Relief below, California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id.* §(a)(13).

12
13
14
15

169.   Defendants' False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, and Loot Boxes violate the unlawful prongs of the UCL since they violate 16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and (a)(13).

16
17
18

170.   The False Bonus Packs misrepresent the existence of a sale whereby players can allegedly purchase more items and resources from a pack than they normally could for the same price.

19
20
21

171.   Defendants' use of the False Bonus Packs violates 15 U.S.C. §45(a)(1), 15 U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations, Section 233.

22
23
24
25
26

172.   Defendants also violated and continue to violate Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false discounts from purported former prices that were, in fact, not the prevailing market prices within three months preceding the publication and dissemination of advertisements containing the false former prices.

27
28

173.   Defendants have also violated the "unfair" prong of the UCL by falsely representing that their consumers received a discount from a referenced "original" former

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   price of their False Strikethrough Packs where, in fact, Defendants set an arbitrary price

2   for the goods contained in these packs and then falsely represented the packs had ever

3   been offered for sale without their supposed discount.

4       174.   Additionally, Defendants have violated the "unfair" prong of the UCL by

5   falsely representing that their False Bonus Packs contained unique and specific increases

6   in items or resources when, in fact, they contained the same resources and in-game items

7   as they always do.

8       175.   Defendants have also violated the "unfair" prong of the UCL by engaging in

9   predatory practices designed to foster gambling addiction in consumers, in that they: (a)

10  deploy their microtransactions in a way specifically designed to ensnare players into

11  addictive spending habits; (b) falsely create a sense of urgency, scarcity, and value in order

12  to secure addictive high frequency microtransactions, such as by deploying Loot Boxes,

13  which exploit user competitiveness and foster addiction; and (c) use incremental cost step-

14  ups to prevent players from realizing the true cost of the game and how much they have

15  spent. Defendants' goals in engaging in these practices are far outweighed by the harm

16  they cause.

17      176.   These acts and practices are unfair because they were likely to cause

18  consumers to falsely believe that Defendants were offering value, discounts, or bargains

19  from the prevailing market value or worth of the products sold that do not, in fact, exist. As

20  a result, purchasers (including Plaintiff) reasonably understood that they were receiving

21  valuable price reductions on purchases of in-game items. This, in turn, has induced

22  reasonable purchasers to buy such products from Defendants that they would not have

23  otherwise purchased.

24      177.   The gravity of the harm to Plaintiff and members of the Classes resulting from

25  these unfair acts and practices outweighs any conceivable reasons, justifications, or

26  motives that Defendants may have had for engaging in such deceptive acts and practices.

27      178.   Additionally, Defendants have violated the "fraudulent" prong of the UCL

28  because their marketing and advertising materials included false "original" prices for their

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   False Strikethrough Packs, and because these same materials also suggested that the

2   offers in the False Bonus Packs and False Limited Availability Packs were unique, limited,

3   and would no longer be available at those price points following the conclusion of its sale

4   events. In actuality, the packs never contained the limited time deals or discounts they

5   purported to offer.

6       179.    Defendants' acts and practices deceived Plaintiff and the Classes at large.

7   Specifically, Plaintiff and the Classes relied on these misleading and deceptive

8   representations regarding the limited-time bonuses they could expect to receive in the

9   packs. Each of these representations and deceptions played a substantial role in Plaintiff's

10  decisions to purchase the packs, and Plaintiff would not have done so in the absence of

11  such representations.

12      180.    Plaintiff and the Classes never received the benefit of their bargains with

13  Defendants, in that the "discounted" resources offered for sale in the packs did not give

14  them the anticipated competitive edge against their opponents. Competitors could simply

15  purchase packs at the same false sale pricing, or with the same number of items, or the

16  same pack availability, notwithstanding Defendants' representations that these were

17  limited time offers.

18      181.    Similarly, players who purchased the False Bonus Packs and the False

19  Strikethrough Packs defensively (to protect against becoming overpowered by opponents

20  whom they believed had been able to take advantage of the purportedly limited-time

21  bonuses) were deprived of the benefit of their bargains, because the threat itself was a

22  fabrication. There was never a risk of falling behind due to a player's failure to purchase

23  items at their discounted price, because the price was always discounted.

24      182.    As a result of these violations under each of the fraudulent, unfair, and

25  unlawful prongs of the UCL, Defendants have been unjustly enriched at the expense of

26  Plaintiff and members of the proposed Classes. Specifically, Defendants have been

27  unjustly enriched by obtaining revenues and profits that they would not otherwise have

28  obtained absent their false, misleading, and deceptive conduct.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

183.   Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiff and the class members. As such, Plaintiff requests that this Court cause Defendants to restore this money to Plaintiff and all class members, and to enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiff, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**SECOND CLAIM FOR RELIEF**

**Violation of California's False Advertising Law ("FAL")**

**Cal. Business & Professions Code §§17500 *et seq.***

**(By Plaintiff, individually and on behalf of All Classes)**

184.   Plaintiff incorporates by reference all allegations in this First Amended Complaint and restates them as if fully set forth herein.

185.   The FAL prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

186.   Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

187.   The False Strikethrough Packs and the False Bonus Packs misrepresent the existence of a sale whereby players can allegedly purchase packs at a discounted price, or with an increased percentage of items or resources. The False Limited Availability Packs misrepresent the exclusive nature, and therefore competitive value, of the packs.

188.   Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiff and the class members. As such, Plaintiff requests that this Court cause Defendants to restore this money to Plaintiff and all class members, and to prevent Defendants from continuing to violate the FAL, and/or from violating the FAL in the

1  future. Otherwise, Plaintiff, the class members, and members of the general public may be

2  irreparably harmed and/or denied an effective and complete remedy if such an order is not

3  granted.

4  **THIRD CLAIM FOR RELIEF**

5  **Violation of the California Consumers Legal Remedies Act ("CLRA")**

6  **Cal. Civ. Code. §§1750 *et seq.***

7  **(By Plaintiff, individually and on behalf of All Classes)**

8  189.   Plaintiff incorporates by reference all allegations in this First Amended

9  Complaint and restates them as if fully set forth herein.

10  190.   Plaintiff and the other class members are consumers within the meaning of

11  Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ.

12  Code §§1761(e) and 1770.

13  191.   Defendants are "persons" within the meaning of Cal. Civ. Code §§1761(c)

14  and 1770, and they sell "goods or services" within the meaning of Cal. Civ. Code

15  §§1761(a)–(b) and 1770.

16  192.   GOG and the in-app purchases are a "good" or "service" within the meaning

17  of Cal. Civ. Code. §§1761(a) and (b).

18  193.   Defendants have violated Cal. Civ. Code. §1770(a)(5)'s proscription against

19  representing that goods have characteristics, uses, benefits, or quantities that they do not

20  have. The False Limited Availability Packs represent that they have the benefit of

21  conferring a competitive advantage, but those benefits are illusory.

22  194.   Defendants have violated Cal. Civ. Code. §1770(a)(9)'s proscription against

23  advertising goods or services with intent not to sell them as advertised. The False Bonus

24  Packs falsely advertise that a pack of goods has extra value by containing a significant

25  increase in items or resources relative to normal versions of the same pack. The False

26  Limited Availability Packs falsely indicate that a particular pack can only be purchased a

27  finite number of times by competing players.

28  195.   Defendants have violated Cal. Civ. Code. §1770(a)(13)'s proscription against

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts via False Strikethrough Packs, misrepresenting the existence of special sales through their False Bonus Packs, and misrepresenting the exclusive nature, and therefore competitive value, of the packs through their False Limited Availability Packs.

196.    Defendants have violated Cal. Civ. Code. §1770(a)(14)'s proscription against representing that a transaction conferred rights or obligations that it did not have. The False Limited Availability Packs falsely represent that the purchase confers the right of a competitive advantage, which it does not.

197.    Defendants have violated Cal. Civ. Code. §1770(a)(16)'s proscription against representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not by misrepresenting that the purchasers have received a competitive advantage in the game by purchasing "sale" and "limited availability" items.

198.    Defendants have violated Cal. Civ. Code. §1770(a)(17)'s proscription against representing that the consumer will receive an economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction, by misrepresenting that the purchaser of False Limited Availability Packs would receive an economic benefit (*i.e.*, more goods than other players) and therefore a competitive advantage as compared to players who did not take advantage of limited-availability sales. The economic benefit is contingent on other players not purchasing those same packs, but there is not actually a limited supply of packs.

199.    Plaintiff and the other class members suffered actual damages as a direct and proximate result of the Defendants' actions, concealment, and/or omissions in the advertising, marketing, and promotion of their in-app purchases, in violation of the CLRA, as evidenced by the substantial sums Defendants pocketed from Plaintiff and the class members.

200.    On October 13, 2023, Plaintiff, through counsel, sent a CLRA demand to

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1   Defendants that provided notice of Defendants' violation of the CLRA and demanded that

2   they correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive

3   practices complained of herein. The letter also stated that if Defendants refused to do so,

4   Plaintiffs would seek damages in this action pursuant to the CLRA.

5       201.   Defendants failed to rectify the problems associated with the actions detailed

6   above. Thus, pursuant to Cal. Civ. Code. §1782, Plaintiff now seeks actual, punitive, and

7   statutory damages, as appropriate, against Defendants pursuant to the CLRA.

8                           **FOURTH CLAIM FOR RELIEF**

9                                     **Fraud**

10          **(By Plaintiff, individually and on behalf of All Classes)**

11      202.   Plaintiff incorporates by reference all allegations in this First Amended

12  Complaint and restates them as if fully set forth herein.

13      203.   Defendants represented to Plaintiff that various purchased packs were on

14  sale in that they were offered at a lower price than normal, that certain packs were offered

15  with an increased percentage of items and resources compared to their normal

16  counterparts, and that pack purchases were only available in limited quantities.

17      204.   These representations were false because the packs were never offered at

18  higher prices, the increased percentage versions of the packs were identical to their normal

19  counterparts, the packs were not actually available in scarce quantities to other players in

20  the State or to the individual player making the purchases, and the stated number of other

21  players that had purchased the packs was fictitious.

22      205.   Defendants intentionally designed the graphical images on the

23  advertisements to attract Plaintiff to the enticing but false claims regarding the existence

24  of sales, item and resource bonuses, and artificial scarcity.

25      206.   Plaintiff reasonably relied upon the claims made in Defendants'

26  advertisements in deciding to purchase the aforementioned packs.

27      207.   Upon purchasing the packs, Plaintiff was harmed because, had Plaintiff

28  known Defendants' claims were false, he would not have made those purchases.

1   208.   Plaintiff's reliance on Defendants' misrepresentations in their pack

2   advertisements was a substantial factor in causing harm to Plaintiff.

3   209.   Defendants' conduct has therefore caused and is causing immediate and

4   irreparable injury to Plaintiff and the class members and will continue to both damage

5   Plaintiff and the class members and deceive the public unless enjoined by this Court.

6   **FIFTH CLAIM FOR RELIEF**

7   **Unjust Enrichment**

8   **(By Plaintiff, individually and on behalf of All Classes)**

9   210.   Plaintiff incorporates by reference all allegations in this First Amended

10   Complaint and restates them as if fully set forth herein.

11   211.   Defendants misrepresented the value of the items or resources purchased

12   in the False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs,

13   and/or Loot Boxes or any packs for which Plaintiff was double charged.

14   212.   Plaintiff spent $46.91 and cumulatively, members of the classes spent

15   hundreds of millions on items and resources, induced by Defendants, thereby enriching

16   Defendants.

17   213.   It would be unfair for Defendants to keep the money spent without

18   compensating Plaintiff.

19   **SIXTH CLAIM FOR RELIEF**

20   **Violations of CIPA Cal. Penal Code §630 et seq.**

21   **(By Plaintiff, individually and on behalf of All Classes)**

22   214.   Plaintiff incorporates by reference all allegations in this First Amended

23   Complaint and restates them as if fully set forth herein.

24   215.   Defendants intentionally tapped and/or made an unauthorized connection to

25   Plaintiff's communications on his devices. These include video recordings, audio

26   recordings, and written communications.

27   216.   Plaintiff did not consent for Defendants to tap into his connections,

28   communications, or devices.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

217.   Without consent from Plaintiff, Defendant read, attempted to read, and/or learned the contents of Plaintiff's communications, in that the logfiles found for Defendants' other games indicate Defendants caused "remote streams" of videos, surreptitiously enabled device speakerphones, caused devices to "save for FunPlus" records of these interactions, and then caused Plaintiff's devices to transmit such data to various third parties.

218.   Defendants attempted to and in fact did use this data, and communicate it to third parties, such as by sending it to various third-party IP addresses, as demonstrated by the logfiles.

219.   To the extent any third parties were involved in the execution of this scheme, Defendants aided, agreed with, employed, permitted, or otherwise caused to be done the unlawful acts described herein.

220.   These actions violate Cal. Penal Code §631(a).

221.   Accordingly, Defendants are liable to Plaintiffs and the putative classes for their actual damages, statutory damages, exemplary damages, and injunctive relief.

**SEVENTH CLAIM FOR RELIEF**

**Violations of California's Comprehensive Computer Data and Access Fraud Act**

**("CDAFA"), Cal. Penal Code §502**

**(By Plaintiff, individually and on behalf of All Classes)**

222.   Plaintiff incorporates by reference all allegations in this First Amended Complaint and restates them as if fully set forth herein.

223.   CDAFA makes it unlawful for a party to knowingly access, without permission, another's computer or device to wrongfully control or obtain data, or to make use of any data on the computer.

224.   Here, Defendants did not obtain permission, because they assured Plaintiff and the putative class that the app did not collect consumer data.

225.   The logfiles further demonstrate that Defendants did not have permission to access Plaintiff's devices because they suggest overrides of user settings (such as setting

43

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   the device to speakerphone or remotely enabling video and audio sharing).

2        226.   Upon information and belief, Defendants used this data for profit, in that it

3   was shared with third parties internationally.

4        227.   Plaintiff is entitled to compensatory damages, punitive damages, and

5   attorney's fees to any individual harmed by these violations in accordance with Cal. Penal

6   Code §502(e)(1), (2), and (4).

7                        **EIGHTH CLAIM FOR RELIEF**

8                          **Invasion of Privacy**

9            **(By Plaintiff, individually and on behalf of All Classes)**

10       228.   Plaintiff incorporates by reference all allegations in this First Amended

11  Complaint and restate them as if fully set forth herein.

12       229.   Article I, §1 of California's Constitution confers a constitutional right to

13  privacy.

14       230.   Defendants' conduct in secretly using Plaintiff's and the putative class

15  members' devices to surreptitiously record them and transmit that data to third parties

16  violated Plaintiff's privacy rights.

17       231.   Plaintiff has a right not to be recorded by his own devices without his

18  knowledge or consent.

19       232.   Defendants have intruded upon these privacy interests.

20       233.   These intrusions are a serious invasion of privacy because of the collection

21  and disclosure of audio and visual recordings, as well as general user data, particularly in

22  the face of promises that no such data would be gathered or used.

23       234.   Defendants acted with oppression, fraud, or malice in that they

24  misrepresented their data collection practices, attempted to hide the logfiles in a different

25  folder on users' devices with an unusual filepath, told users that they were not collecting

26  data when in fact they were, and took control of Plaintiff's device functions in order to collect

27  the highly sensitive and personal data.

28       235.   Plaintiff and the putative classes have been damaged by Defendants'

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   invasion of their privacy and are entitled to compensation in the form of actual and punitive

2   damages.

3                                **NINTH CLAIM FOR RELIEF**

4                                 **Intrusion Upon Seclusion**

5                **(By Plaintiff, individually and on behalf of All Classes)**

6         236.   Plaintiff incorporates by reference all allegations in this First Amended

7   Complaint and restates them as if fully set forth herein.

8         237.   Defendants intentionally intruded upon Plaintiff's and the class members'

9   seclusion by secretly accessing their devices to record and transmit data about Plaintiff

10  without their knowledge or permission.

11        238.   This was highly offensive in that Defendants did this despite their direct

12  promise that they did not gather or share any data, and where the gathering of this

13  information required Defendants to effectively take over Plaintiff's device.

14        239.   Plaintiff never gave consent for Defendants to gather or transmit this data.

15        240.   Defendants acted with oppression, fraud, or malice in that they

16  misrepresented their data collection practices, attempted to hide the logfiles in a different

17  folder on users' devices with an unusual filepath, told users that they were not collecting

18  data when in fact they were, and took control of Plaintiff's device functions in order to collect

19  the highly sensitive and personal data.

20        241.   Plaintiff and the putative classes have been damaged by Defendants'

21  invasion of their privacy and are entitled to compensation in the form of actual and punitive

22  damages.

23                                **TENTH CLAIM FOR RELIEF**

24           **Violations of Federal Wiretap Act (18 U.S.C. §2510 et. seq)**

25                **(By Plaintiff, individually and on behalf of All Classes)**

26        242.   Plaintiff incorporates by reference all allegations in this First Amended

27  Complaint and restates them as if fully set forth herein.

28        243.   Defendants intentionally intercepted, or endeavored to intercept, Plaintiff's

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    and the putative class members' oral communications, when they enabled remote video

2    and audio capture and transmitted copies of files so captured to unknown third parties.

3          244.   Defendants were not a party to these communications that they intercepted.

4          245.   Plaintiff never gave consent for these claims to be so intercepted.

5          246.   Accordingly, Plaintiff and the putative class members are entitled to statutory

6    damages, along with costs and reasonable attorney's fees.

7          247.   Defendants' conduct was wanton and willful.

8          248.   Plaintiff is therefore additionally entitled to recover punitive damages.

9                              **PRAYER FOR RELIEF**

10         **WHEREFORE**, Plaintiff, on behalf of himself and the proposed Classes, prays for

11   relief and judgment against Defendants as follows:

12         (a)    Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil

13   Procedure, appointing Plaintiff as representatives of the Classes, and designating

14   Plaintiff's counsel as class counsel;

15         (b)    Awarding Plaintiff and the class members compensatory damages and

16   actual damages in an amount exceeding $5,000,000, to be determined by proof;

17         (c)    Awarding Plaintiff and the class members appropriate relief, including actual

18   and statutory damages;

19         (d)    For punitive damages;

20         (e)    For civil penalties;

21         (f)    For declaratory and equitable relief, including a declaration that Defendants

22   violated and have continued to violate California's UCL, the FAL, and the CLRA, and an

23   injunction requiring Defendants to comport with California Business & Professions Code

24   §§17200, *et seq.*, and restitution and disgorgement;

25         (g)    For an order enjoining Defendants from continuing to engage in the wrongful

26   acts and practices alleged herein;

27         (h)    Awarding Plaintiff and the class members the costs of prosecuting this action,

28   including expert witness fees;

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1        (i)    Awarding Plaintiff and the class members' reasonable attorney's fees and

2    costs as allowable by law;

3        (j)    Awarding Plaintiff and the class members reasonable attorney's fees

4    pursuant to Cal. Civ. Proc. Code 1021.5, as this lawsuit seeks the enforcement of an

5    important right affecting the public interest and satisfies the statutory requirements for an

6    award of attorney's fees;

7        (k)    Awarding Plaintiff and the class members actual and punitive damages,

8    reasonable attorney's fees and costs, as well as injunctive relief, pursuant to the CLRA;

9        (l)    Awarding pre-judgment and post-judgment interest; and

10       (m)    Granting any other relief as this Court may deem just and proper.

11

12   Respectfully Submitted,

13   DATED: December 11, 2023        **KRONENBERGER ROSENFELD, LLP**

14

15                           By:   s/ Karl S. Kronenberger

16                                 Karl S. Kronenberger
                                   Katherine E. Hollist (*pro hac vice* forthcoming)

17

18                           **POLLOCK COHEN LLP**
                             Raphael Janove

19                           Adam Pollock
                             George Krebs

20                           *pro hac vice* forthcoming

21                           **JAY KUMAR LAW**

22                           Jay Kumar
                             *pro hac vice* forthcoming

23

24

25                           *Attorneys for Plaintiff and the Proposed Classes*

26

27

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**DEMAND FOR JURY TRIAL**

Plaintiff, by and through his undersigned counsel, hereby demands a trial by jury for all questions of fact that can be decided by a jury in the above-entitled action.

Respectfully Submitted,

DATED: December 11, 2023                    **KRONENBERGER ROSENFELD, LLP**

By: ___s/ Karl S. Kronenberger_____
       Karl S. Kronenberger

*Attorneys for Plaintiff and the Proposed Classes*